# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 9, 2012 Session

## STATE OF TENNESSEE v. SUSAN RENEE BISE

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Greene County**
**No. 09CR353     John F. Dugger, Jr., Judge**

---

**No. E2011-00005-SC-R11-CD - Filed September 26, 2012**

---

Following a burglary in Greene County, the defendant was charged with two counts of aggravated burglary and two counts of theft of property. At the conclusion of the trial, the jury returned verdicts of guilt for one count of facilitation of aggravated burglary and for two counts of theft of property. After finding the presence of one enhancement factor, the trial court imposed concurrent three-year sentences for each offense. The Court of Criminal Appeals found that the enhancement factor did not apply and reduced each of the sentences to two years. Because we find that a sentence imposed by a trial court should be upheld so long as it is within the appropriate sentencing range and is otherwise in compliance with the purposes and principles of the sentencing statute, we reverse the sentence modification by the Court of Criminal Appeals and, upon review under an abuse of discretion standard with a presumption of reasonableness, reinstate the sentence imposed by the trial court.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Amy L. Tarkington, Deputy Attorney General; C. Berkeley Bell, District Attorney General; and J. Chalmers Thompson, Assistant District Attorney General, for the appellant, the State of Tennessee.

Jonathan D. Cooper, Knoxville, Tennessee (on appeal before the Supreme Court) and Charles C. Harrison, Jr., Pigeon Forge, Tennessee (at trial and on appeal before the Court of Criminal Appeals) for the appellee, Susan Renee Bise.

# OPINION
## Facts and Procedural History

In September of 2008, a burglary took place at the Greene County residence of James McElroy. A number of items were stolen. During the course of the investigation, the Greene County Sheriff's Department (the "Sheriff's Department") received information that Susan Renee Bise (the "Defendant") was involved in the crime. She was eventually charged with two counts of aggravated burglary and two counts of theft.

At trial, McElroy testified that his work required travel for "about six to nine months out of the year" and that he spent an equal amount of time at his Greene County residence and his residence in Virginia. He described his Greene County residence, which was located on a mountain top and surrounded by foliage, as "a dream house," and estimated that it was "probably eighty percent complete" at the time of the burglary. Because the residence was still under construction, he kept "a lot of tools" on the premises and had secured the metal gate at the driveway entrance to the property with a "double chain padlock." McElroy was out of town when the burglary took place. Upon his return, he discovered his gate lying in the driveway. Four-by-four posts on either side of the gate had been snapped off near ground level. As he entered the basement, McElroy noticed that there were a number of items missing. He then found a pile of his tools upstairs that "looked like they had been gathered to be loaded." After contacting the Sheriff's Department, McElroy provided the investigating officer with a list of the missing items, which amounted to approximately $7,500 in value. Because several of the stolen items, including a table saw, ladders, "a fifteen foot pole saw," and an air compressor, were quite large, McElroy believed that more than one trip would have been required for their removal.

On February 13, 2009, James Gammons discovered a saw, vise, drill press, and table saw on the side of a road. He placed the items in his vehicle, returned them to his residence, and contacted the Sheriff's Department. Afterward, McElroy identified the items as among those taken from his home and, upon inspection, determined that only one of the items, the saw, was usable.

Chad Warner testified at the Defendant's trial on behalf of the State.[1] He first acknowledged that in February of 2009, some five months after the burglary, he had assaulted the Defendant and her son, Jason Jr., and had been criminally charged as a result. He also acknowledged that he had asked the Defendant and her son to drop the charges against him and, when they refused, he informed Detective James Randolph that the

---

[1] At the time of the Defendant's trial, Warner was serving a sentence for submitting a false police report. Warner had been involved in a car accident and had informed the authorities that he was not driving at the time of the accident, when in fact he was.

Defendant, her husband, Jason Bise, Sr., and her son, Jason Jr., had tried "to sell [him] some stolen goods," including chain saws, a table saw, a motorcycle, and a television. According to Warner, the Bises had driven "over a gate" and gained possession of the items with the help of "a Mexican named Domingo."

Detective Randolph, who was assigned to investigate the burglary at the McElroy residence, initially was unable to locate the stolen items. When informed by Warner that the Bises had attempted to sell him stolen items, he went to the residence of Jason Jr. and found a motorcycle matching the description provided by Warner in his earlier statement. After providing Miranda warnings, Detective Randolph questioned Jason Jr. and learned that the Defendant and an individual of Mexican descent may have been involved in the burglary.

On March 25, 2009, Detective Randolph met with the Defendant, who agreed to submit to questioning. In her statement to the detective, she admitted that in September of 2008, her son, Jason Jr., had driven over a driveway gate in order to gain access to a residence and that she sat in the truck while Jason Jr. and Hosea Hernandez entered the house and "took a bunch of stuff." The Defendant told Detective Randolph that when they returned, she informed them that she "didn't want anything to do with this" and that after they got more beer, she "passed out, and Jason and [Hernandez] went back to the house . . . and took some more stuff." In her statement, the Defendant also admitted that some of the stolen items were still in her root cellar several months after the burglary, when the assault by Warner took place. She informed the detective that after the assault, she instructed her son to get rid of the stolen items "and he took them down on Pate's Hill Road and set them out along the road." The Defendant also told Detective Randolph that approximately one month after the burglary, her husband and Hernandez brought a motorcycle to her residence, claiming that Hernandez had purchased it. The Defendant further stated that later, when Hernandez was deported, he gave the motorcycle to Jason Jr.

The Defendant, who testified in her own defense, recalled that on the day of the burglary she went swimming with her son and Hernandez, and that in the ensuing forty-five minutes to an hour, she and the two men consumed a twelve-pack of beer. She claimed that afterward, Hernandez asked Jason Jr. to "take him to [a particular] address to pick up his personal belongings." The Defendant maintained that although she had asked her son not to drive because of his drinking, he did so anyway, taking her and Hernandez to the site of the burglary. The Defendant testified that just before Jason Jr. drove over the gate, she warned him not to do so and asked to be taken home. She claimed that she remained inside the truck while Jason Jr. and Hernandez entered the residence and loaded the stolen items into the truck. She recalled that after they returned to her residence, Jason Jr. and Hernandez placed the stolen items in her root cellar while she went inside and passed out. Consistent with her earlier statement to Detective Randolph, the Defendant denied going back to the

McElroy residence a second time, claiming that she slept while Jason Jr. and Hernandez returned and "took more stuff." The Defendant testified that when she discovered the items did not belong to Hernandez, she told her son to get rid of them.

The Defendant further explained that she became acquainted with Warner because he had worked for her family's construction business. She stated that she and Jason Jr. pressed charges against Warner after he assaulted them and that she refused to drop the assault charges because she had "about lost [her] son" as a result of the incident. The Defendant denied ever speaking with Warner about either taking the items from the McElroy residence or trying to sell him the items. She further contended that the items described by Warner could have been tools her family owned in their construction business. While admitting that she told her son to get rid of the stolen items soon after the incident with Warner, the Defendant denied that it had anything to do with the possibility that Warner might talk to the police.

The jury found the Defendant guilty of facilitation[2] of aggravated burglary[3] as a lesser-included offense in count one, and theft of property valued at one thousand dollars or more but less than ten thousand dollars[4] in counts two and four. She was found not guilty of aggravated burglary in count three.

---

[2] See Tenn. Code Ann. § 39-11-403(a) (2010) ("A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, . . . the person knowingly furnishes substantial assistance in the commission of the felony.").

[3] Aggravated burglary is defined as "burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." Id. § 39-14-403(a). Section 39-14-401(1)(A) defines a "habitation" as "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." Section 39-14-402(a) defines "burglary" as occurring when a person, without the effective consent of the property owner,

> (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault;
> (2) Remains concealed, with the intent to commit a felony, theft or assault, in a building;
> (3) Enters a building and commits or attempts to commit a felony, theft or assault; or
> (4) Enters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault.

[4] See id. § 39-14-103(a) ("A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."), -105(3) (classifying theft of property as a Class D felony "if the value of the property or services obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000)").

-4-

As a Range I offender, the Defendant qualified for a sentence between two and four years on each offense. Id. § 40-35-112(a)(4). At the sentencing hearing, Detective Mike Fincher testified that burglaries were a particular problem in Greene County and that the Sheriff's Department had worked almost four hundred burglary cases over a one-year period. During that time, one residential burglary involved a seventeen-year-old burglar who was shot and killed by the homeowner. None of the other burglaries investigated during that time, however, had resulted in death. McElroy also testified at the sentencing hearing, confirming that the stolen items had an approximate value of $7,500 and that the cost to repair the damage to his gate and his residence was between $500 and $700. Because he had lost his "sense of safety" at the residence, he had installed an alarm, a video monitoring system, and safety bollards at the gate to the driveway at a cost in excess of $7,000.

At the conclusion of the sentencing hearing, the trial court found that there were no mitigating factors and only one applicable enhancement factor—that the Defendant had no hesitation about committing a crime when the risk to human life was high. See id. § 40-35-114(10). The trial court, while recalling two specific incidents which had resulted in death and severe injury to burglars of residences, observed that "when you're messing with people's homes, there is a great risk of someone getting hurt or killed," pointing out that even though the Defendant had remained in the car, the homeowner could have arrived at any time, thereby placing everyone involved at risk. While observing that the Defendant, who was thirty-eight years old at the time of sentencing, should have provided her son with guidance, the trial court found that she instead was drinking to excess with him and involving herself in criminal behavior "off the scale." The trial court expressed particular dissatisfaction with the fact that the Defendant had allowed her son to store stolen property at her house for five months and disposed of the items only after the altercation with Warner. Because some four hundred burglaries had already been committed in Greene County during the course of the year, the trial court gave "great weight" to the need for deterring others likely to commit similar offenses, see id. § 40-35-103(1)(B), emphasized the amount of danger associated with residential burglaries, and imposed an effective three-year sentence,[5] concluding that confinement was necessary to avoid depreciating the seriousness of the offenses.

The Defendant appealed, arguing that the evidence was insufficient to support her convictions for theft; that the jury had returned inconsistent verdicts; and that the trial court had erred by applying the enhancement factor. The Court of Criminal Appeals, holding that the evidence was sufficient and that any inconsistency in the jury verdicts was no basis for

---

[5] The Defendant was sentenced to three years for the facilitation of aggravated burglary conviction and three years for each of the theft convictions, which were to be served concurrently for an effective sentence of three years.

relief, affirmed the convictions, but modified the sentences to two years each because the trial court had based the greater sentences upon potential rather than demonstrated danger. As noted by the court, at the time of the burglary, the victim was not home; he lived there only twenty-five percent of the year; there was no evidence that the Defendant or her accomplices had weapons; and although the victim returned with a gun, it was not clear as to when the burglary took place in relation to the victim's return. State v. Bise, No. E2011-00005-CCA-R3-CD, 2011 WL 4090792, at *9 (Tenn. Crim. App. Sept. 15, 2011). Although all three of the panel of judges agreed that the trial court had erroneously applied the single enhancement factor, Bise, 2011 WL 4090792, at *9; see also id. (Woodall, J., concurring in part & dissenting in part); id. at *12 (Williams, J., concurring in results only), Judge Thomas Woodall dissented as to the sentence modification, id. at *9, writing that the implication by the majority "that [a] . . . sentence . . . cannot be increased above the minimum unless the trial court finds applicable an enhancement factor . . . obviously violates Blakely[ v. Washington, 542 U.S. 296 (2004)]." Bise, 2011 WL 4090792, at *11.

While conceding that the trial court misapplied the single enhancement factor, the State filed an application for permission to appeal, contending that a sentence otherwise in compliance with the statutory scheme and properly within the applicable range should be upheld, notwithstanding the erroneous finding.

**Analysis**
The State argues that the majority opinion, if upheld, would imply that no sentence other than the minimum can be imposed by a trial judge absent a finding of a statutory enhancement factor, an interpretation that would violate the United States Supreme Court's ruling in Blakely and its progeny. Based on the broad discretionary authority afforded trial courts by the 2005 amendments to Tennessee's Criminal Sentencing Reform Act of 1989, the State asserts that sentences within the appropriate statutory range should be upheld unless "a trial court wholly fails to follow Tennessee's sentencing regime." Because the trial court in this instance "specifically considered the purposes and principles of sentencing," the State submits that the original three-year sentences should be upheld.

While acknowledging that the 2005 amendments afforded trial courts more discretion as to sentencing, the Defendant asserts that the presumption of correctness of a sentence fails in the event of a misapplication of an enhancement or mitigating factor and, in consequence, requires de novo appellate review. The Defendant argues that under the de novo standard of review, appellate courts "may re-weigh the properly applied factors and sentencing principles and independently assess whether the sentence is appropriate or should be modified." The Defendant further contends that the Court of Criminal Appeals' lead opinion, which independently assessed the propriety of the sentences, correctly addressed the statutory principles in assessing the minimum two-year sentences.

-6-

# I. Development of Sentencing Law on the State and Federal Levels

In order to appropriately frame our analysis of the issue before us, we have found it helpful to conduct a comprehensive review of the development of sentencing in Tennessee and the manner in which it has been shaped by the recent decisions of the United States Supreme Court.

## A. Criminal Sentencing Reform Act of 1982

For much of our history, sentencing has been indeterminate in nature and has fallen within the province of judges and parole boards; as a result, "there was little for appellate or supreme courts to oversee" during the first 200 years of the criminal law. John F. Pfaff, The Future of Appellate Sentencing Review: Booker in the States, 93 Marq. L. Rev. 683, 687 (2009) [hereinafter Pfaff, 93 Marq. L. Rev.]. Beginning in the 1970s, a majority of the states began to modify their sentencing laws in a variety of ways. Id. Tennessee's Criminal Sentencing Reform Act of 1982 ("1982 Act"), which implemented sentencing ranges, see Act of Apr. 28, 1982, ch. 868, 1982 Tenn. Pub. Acts 556, 561-62 (codified at Tenn. Code Ann. § 40-35-109(a)–(f) (1982) (repealed)), and determinate sentences, serves as an example of this reform. See id. at 570 (codified at Tenn. Code Ann. § 40-35-211 (felonies), -302 (misdemeanors) (1982) (repealed)); see also David L. Raybin, The Blakely Fix: New Tennessee Law Restores Judicial Discretion in Criminal Sentencing, 41 Tenn. B.J. 14, 19 (2005) [hereinafter Raybin, 41 Tenn. B.J.]. The 1982 Act contained a list of purposes[6] and a number of different sentencing considerations, or principles,[7] which were to be considered

---

[6] The purposes were as follows:

> (1) [To p]unish a defendant by assuring the imposition of a sentence he deserves in relation to the seriousness of his offense;
> (2) [To a]ssure the fair and consistent treatment of all defendants by eliminating unjustified disparity in sentences, providing fair warning of the nature of sentence to be imposed, and establishing fair procedures for the imposition of sentences; and
> (3) [To p]revent crime and promote respect for law by:
> > (A) Providing an effective deterrent to others likely to commit similar offenses;
> > (B) Restraining defendants with a long history of criminal conduct; and
> > (C) Encouraging rehabilitation by promoting correctional programs that elicit the voluntary cooperation and participation of defendants.

Tenn. Code Ann. § 40-35-102 (1982) (repealed).

[7] Tennessee's Criminal Sentencing Reform Act, as enacted in 1982, revised in 1989, and in its current form, includes several sentencing "considerations" in Tennessee Code Annotated section 40-35-103. This section also refers to the considerations as "principles." In other sections of the Act, see, e.g., id. § 40-35-210(d) (2010); id. § 40-35-210(b)(3) (1982) (repealed), and in our previous opinions discussing the Act, see, e.g., State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008); State v. Ashby, 823 S.W.2d 166, 169

(continued...)

by the trial court. There were no presumptive sentences under the 1982 Act, which allowed trial courts to "exercise guided discretion within the terms of the Act" and to impose sentences "on a case-by-case basis." State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986). Following the sentencing hearing, the trial court was to "first determine the appropriate range of sentence," Tenn. Code Ann. § 40-35-210(a) (1982) (repealed),[8] and to then "determine the specific sentence and the appropriate combination of sentencing alternatives" by considering:

(1)    The evidence, if any, received at the trial and the sentencing hearing;

(2)    The pre-sentence report;

(3)    The principles of sentencing and arguments as to sentencing alternatives;

(4)    The nature and characteristics of the criminal conduct involved;

---

[7](...continued)
(Tenn. 1991), the term "principles" and the phrase "purposes and principles" are used as encompassing references to the purposes set out in section 40-35-102 and the considerations set out in section 40-35-103. In an effort to ensure consistency and clarity, this opinion will refer to the sentencing purposes in section 40-35-102 as "purposes," the sentencing considerations in section 40-35-103 as "principles," and the purposes and considerations together as "purposes and principles."

Under the 1982 Act, the principles were as follows:

(1) Sentences involving confinement should be based on the following considerations:
    (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
    (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
    (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.
(2) The sentence imposed should be no greater than that deserved for the offense committed.
(3) Inequalities in sentences that are unrelated to a purpose of this chapter should be avoided.
(4) The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed.
(5) The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of term to be imposed. The length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence.

Tenn. Code Ann. § 40-35-103 (1982) (repealed).

[8] In determining the appropriate range, the trial court was required to consider the defendant's status as either a persistent offender, an especially aggravated offender, or an especially mitigated offender. See id. §§ 40-35-106 to -108.

-8-

(5)     Evidence and information offered by the parties on the mitigating and enhancement factors[9] . . . ; and

(6)     Any statement the defendant wishe[d] to make in his own behalf about sentencing.

Id. § 40-35-210(b). Trial courts were required to "place on the record either orally or in writing [their] findings of fact and reasons" for imposing the sentence. Id. § 40-35-210(c).

Under the 1982 Act, a defendant was allowed to "appeal from the length, range, or the manner of service of the sentence imposed," as well as from "the imposition of consecutive sentences." Id. § 40-35-402(a). The defendant's appeal could be based upon either or both of the following grounds: "(1) [t]he sentence was not imposed in accordance with th[e 1982 Act]; or (2) [t]he mitigating and enhancement factors were not weighed properly, and the sentence [wa]s excessive under the principles of [the 1982 Act]." Id. § 40-35-402(b). If the State wished to appeal, it could only do so based upon its disagreement with the sentencing range or manner of service, id. § 40-35-403(a), or on the grounds that the trial court utilized the wrong range; improperly determined that the defendant was not a persistent offender "and/or that the offense was not an especially aggravated [one]"; granted all or partial probation; ordered some or all sentences to run concurrently; or "improperly found the defendant to be an especially mitigated offender." Id. § 40-35-403(b)(1)–(4).

In its original form, the 1982 Act did not specify a standard of review on appeal. Later, however, the Act was amended to require appellate courts to "conduct a de novo review on the record, . . . without a presumption that the determinations made by the court from which the appeal is taken are correct." Act of Dec. 11, 1985, ch. 5, § 31, 1985 Tenn. Pub. Acts 22, 34 (codified at Tenn. Code Ann. § 40-35-402(d) (Supp. 1986) (repealed)); see also Moss, 727 S.W.2d at 238-39 (quoting Tenn. Code Ann. § 40-35-402(d) (Supp. 1986) (repealed)).[10]

---

[9] See id. §§ 40-35-110, -111.

[10] If the appeal was by the defendant, the appellate court was authorized to dismiss the appeal; "[a]ffirm, reduce, vacate, or set aside the sentence imposed"; "[r]emand the case or direct the entry of an appropriate sentence or order"; or "[d]irect any further proceedings appropriate or required under the circumstances." Tenn. Code Ann. § 40-35-402(c) (1982) (repealed). If the appeal was by the State, the appellate court could affirm, vacate, set aside, or reduce the sentence or remand, but it could not "increase the specific length of the sentence by the trial court if the sentence was imposed within the proper range and if the defendant was properly sentenced as an especially aggravated offender or a persistent offender or both." Id. § 40-35-403(c).

## B. Criminal Sentencing Reform Act of 1989

Under the 1982 Act, "[s]entencing practices became totally disparate because [it] was enacted without the benefit of prison population projections and other tools to assess the impact of such a major sentencing alteration." Raybin, 41 Tenn. B.J. at 19. "Within a few years [Tennessee] prisons were filled to capacity," causing the governor "to call the General Assembly into Special Session in 1985 to solve the . . . problem." Id. at 20. In consequence, the Tennessee Sentencing Commission, a creation of the General Assembly, drafted the Criminal Sentencing Reform Act of 1989 ("1989 Act"). Id. The 1989 Act "create[d] a matrix by which convicted criminal defendants [were] sentenced based upon the seriousness of the crime committed and the number of prior convictions the defendant ha[d]." Carter, 254 S.W.3d at 342. Similar to the 1982 Act, the 1989 Act listed its purposes, see Tenn. Code Ann. § 40-35-102 (1990), and specifically recognized "that state prison capacities and the funds to build and maintain them are limited." Id. § 40-35-102(5). First priority for prison space was reserved for those defendants "committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation." Id. A defendant who did not meet these criteria and was an especially mitigated offender or standard offender "convicted of a Class C, D or E felony" was "presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Id. § 40-35-102(6). Similarly, trial courts were instructed to implement the purposes of the 1989 Act by applying sentencing principles, see id. § 40-35-103, that were almost identical to those in the 1982 Act, merely adding a provision encouraging trial judges "to use alternatives to incarceration that include requirements of reparation, victim compensation and/or community service." Id. § 40-35-103(6).[11]

The 1989 Act classified felonies for sentencing purposes into five categories, see id. § 40-35-110(a)(1)–(5),[12] and placed each defendant into one of five categories: standard offender,[13] multiple offender,[14] persistent offender,[15] career offender,[16] or especially mitigated

---

[11] The 1989 Act also included a list of sentencing alternatives. See id. § 40-35-104.

[12] The 1989 Act also placed misdemeanor offenses into three categories. See id. § 40-35-110(c)(1)–(3).

[13] Id. § 40-35-105.

[14] Id. § 40-35-106.

[15] Id. § 40-35-107.

[16] Id. § 40-35-108.

offender,[17] which depended on, among other things, the number of prior convictions.  This finding related to the range in which a defendant would be sentenced.  Sentencing ranges were classified as "Range I," "Range II," and "Range III," with corresponding ranges for all five classes of felonies.  See id. § 40-35-112.

As under the 1982 Act, the 1989 Act first required the trial court to determine the appropriate sentencing range, id. § 40-35-210(a), and then directed it to consider the factors articulated in Tennessee Code Annotated section 40-35-210(b), which remained unchanged from the 1982 Act.  Importantly, the 1989 Act set a presumptive sentence for the various classes of felonies: if enhancement[18] or mitigating[19] factors were not present, the presumptive sentence for Class B, C, D, and E felonies was the minimum in the applicable range.  Absent enhancement or mitigating factors, the presumptive sentence for Class A felonies was the midpoint in the applicable range.  Id. § 40-35-210(c) (Supp. 2001).[20]  If enhancement but not mitigating factors were present, the trial court could set the sentence for a Class B, C, D, or E felony "above the minimum in that range but still within the range."  Id. § 40-35-210(d) (Supp. 2001).  If the same was true for a Class A felony, the trial court was required to "set the sentence at or above the midpoint of the range"; if, however, there were mitigating but no enhancement factors, the trial court was required to "set the sentence at or below the midpoint of the range."  Id.[21]  If enhancement and mitigating factors were present for purposes of a Class B, C, D, or E felony, the trial court was required to "start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors."  Id. § 40-35-210(e) (Supp. 2001).  If the same was true for a Class A felony, the court was required to "start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors."  Id.[22]  As previously provided

---

[17] Id. § 40-35-109.

[18] See id. § 40-35-114.

[19] See id. § 40-35-113.

[20] As originally enacted, the 1989 Act merely provided that "[t]he presumptive sentence shall be the minimum sentence in the range if there are no enhancement or mitigating factors."  Id. § 40-35-210(c) (1990).

[21] As originally enacted, there was no distinction made between Class A felonies and the other classes.  See id. § 40-35-210(d) (1990).

[22] As originally enacted, there was no distinction made between Class A felonies and the other classes.  See id. § 40-35-210(e) (1990).

under the 1982 Act, the 1989 Act required the trial court to place its reasons for imposing the sentence on the record. See id. § 40-35-210(f).

Under the 1989 Act, a defendant could appeal "the length, range or the manner of service of the sentence" as well as the imposition of consecutive sentences. Id. § 40-35-401(a). The statutory grounds for the defendant's appeal were: (1) that the sentence was not imposed in accordance with the Act; and/or (2) that the trial court improperly weighed the enhancement and mitigating factors "and the sentence [wa]s excessive under the sentencing [principles]." Id. § 40-35-401(b)(1)–(2). The State was authorized to appeal "the length, range or manner of the service of the sentence" as well as the imposition of concurrent sentences. Id. § 40-35-402(a). The statutory grounds for a State appeal were as follows: (1) the defendant was sentenced within the wrong range; (2) part or all of the sentence was on probation; (3) part or all of the sentences ran concurrently; (4) the trial court erroneously found the defendant to be an especially mitigated offender; or (5) the court improperly weighed the enhancement and mitigating factors. Id. § 40-35-402(b)(1)–(5).

The 1989 Act provided for "a de novo [appellate] review on the record" but further required that "[s]uch review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Id. §§ 40-35-401(d) , -402(d). In Ashby, 823 S.W.2d at 169, this Court held that "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." When the trial court failed to articulate the basis for its decision, the presumption was negated and appellate review was "de novo upon the record." State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). The presumption of correctness also failed when trial courts considered "inappropriate mitigating and/or enhancement factors or otherwise fail[ed] to follow the [terms of the] Sentencing Act." Carter, 254 S.W.3d at 345.

### C. Apprendi, Its Progeny, and Their Effect

Beginning in 2000, the United States Supreme Court released a series of opinions that fundamentally altered the sentencing landscape at both the federal and state levels.[23] See State v. Gomez, 163 S.W.3d 632, 662 (Tenn. 2005) ("Gomez I") (Anderson, J., concurring in part and dissenting in part) (observing that the United States Supreme Court's sentencing

---

[23] In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Court noted that the answer to the issue raised in that case "was foreshadowed by . . . Jones v. United States, 526 U.S. 227 (1999)," in which the Court, interpreting federal law, "noted that 'under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" Apprendi, 530 U.S. at 476 (quoting Jones, 526 U.S. at 243 n.6).

decisions represented major changes); Pfaff, 93 Marq. L. Rev. at 683 (describing the Court's cases as dismantling the states' efforts to effectuate sentencing reform).  In Apprendi, 530 U.S. at 469, the defendant pled guilty to two counts of possession of a firearm under New Jersey law, which provided for a sentence of between five and ten years.  Id. at 468.  A separate statute authorized trial judges to enhance the sentence if, by a preponderance of the evidence, the defendant was found to have "'acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'"  Id. at 469 (quoting N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 2000)).  Pursuant to this statute, the trial judge increased the defendant's sentence on one count to twelve years.  Apprendi, 530 U.S. at 471.  The Supreme Court held that "[o]ther than the fact of a prior conviction," the Due Process Clause of the Fourteenth Amendment requires that a jury find beyond a reasonable doubt "any fact that increases the penalty for a crime beyond the prescribed statutory maximum."  Id. at 490.  Accordingly, the statute authorizing the trial judge to enhance the sentence was found to be unconstitutional, as it represented "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system."  Id. at 497.

Initially, the scope of the Court's ruling in Apprendi was unclear.  See, e.g., Gomez I, 163 S.W.3d at 663 (Anderson, J., concurring in part and dissenting in part) (observing that the Court's subsequent plurality opinion in Harris v. United States, 536 U.S. 545 (2002), seemed to "indicate[] that Apprendi only applied when a judge found facts used to sentence a defendant above the range for the crime of which he had been convicted").  The import of the Apprendi ruling was clarified, however, by the landmark decisions in Blakely, 542 U.S. at 296, and United States v. Booker, 543 U.S. 220 (2005).[24]  In Blakely, the defendant pled guilty to second degree kidnapping involving domestic violence and use of a firearm under Washington state law, which carried a "'standard range' of 49 to 53 months."  542 U.S. at 299 (quoting Wash. Rev. Code Ann. § 9.94A.320 (2000)).  Washington's sentencing provisions, however, allowed trial judges to impose a higher sentence if "'substantial and compelling reasons justif[ied] an exceptional sentence.'"  Id. (quoting Wash. Rev. Code Ann. § 9.94A.120(2)).  Based on the circumstances of the kidnapping, the trial judge determined

_____

[24] Shortly before Blakely and Booker, however, the Court decided Ring v. Arizona, 536 U.S. 584, 588 (2002), where it re-examined Arizona's capital sentencing scheme in which "the trial judge, sitting alone, determine[d] the presence or absence of the aggravating factors required . . . for imposition of the death penalty."  Previously, in Walton v. Arizona, 497 U.S. 639 (1990), the Court had determined that this statutory scheme did not violate the Sixth Amendment "because the additional facts found by the judge qualified as sentencing considerations, not as 'elements of the offense of capital murder.'"  Ring, 536 U.S. at 588 (quoting Walton, 497 U.S. at 649).  In Ring, the Court overruled Walton to the extent that it was inconsistent with its recent decision in Apprendi, concluding that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  Id.

that an exceptional sentence of 90 months was appropriate, which was "37 months beyond the standard maximum." Id. at 300. On appeal, the defendant argued that Washington's mode of imposing exceptional sentences violated his "right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence." Id. at 301. Applying its holding in Apprendi, the Court agreed, observing that the facts supporting the trial court's findings "were neither admitted by [the defendant] nor found by a jury." Id. at 303. The Court further observed that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority." Id. at 304 (citation omitted) (internal quotation marks omitted). Because the defendant's sentence was "more than three years beyond what the law allowed for the crime to which he confessed," based upon a factual finding by the trial judge rather than by the jury, the sentence was reversed. Id. at 313-14.

The Booker decision included two majority opinions. The "merits" majority, written by Justice Stevens,[25] addressed whether application of the Federal Sentencing Guidelines (the "Guidelines") violated the Sixth Amendment. Booker, 543 U.S. at 226. The Court's decision addressed the constitutionality of an increase in the sentences of Freddie J. Booker and Duncan Fanfan above the "base sentence." See id. at 227-29.[26] The Guidelines permitted a departure from the mandated sentencing range where the trial judge found "'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the [G]uidelines that should result in a sentence different from that described.'" Id. at 234 (quoting 18 U.S.C. § 3553(b)(1) (2000 & Supp. IV)). The merits majority found "no distinction of constitutional significance between the . . . Guidelines and the Washington procedures at issue" in Blakely, as, under either scheme, "the relevant sentencing rules are mandatory and impose binding requirements on all sentencing judges." Booker, 543 U.S. at 233. The merits majority, therefore, reaffirmed the rule established in Apprendi and found that the Guidelines violated constitutional mandates. Id. at 244.

---

[25] Justice Stevens was joined by Justices Scalia, Souter, Thomas, and Ginsburg. These same justices also made up the majority in Apprendi.

[26] While the trial judge in Booker's case chose to enhance his sentence based on the Guidelines, id. at 227, the trial judge in Fanfan's declined to enhance his sentence based upon the Court's ruling in Blakely. Id. at 228-29.

The "remedial" opinion in Booker, a majority ruling authored by Justice Breyer,[27] addressed the question of whether the Guidelines as a whole were inapplicable in light of the merits majority's holding or whether certain provisions could be excised. Id. at 245. Two sections of the Guidelines were held invalid. The first stricken provision was that making the Guidelines mandatory:

> [T]he court shall impose a sentence of the kind, and within the range, referred to in [the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the [G]uidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b)(1) (2000 & Supp. IV) (emphasis added). The remedial majority also struck a second provision, 18 U.S.C. § 3742(e) (2000 & Supp. IV), which articulated "standards of review on appeal, including *de novo* review of departures from the applicable Guidelines range." Booker, 543 U.S. at 259. This section of the Guidelines required appellate courts to determine whether "the sentence depart[ed] from the applicable [G]uideline[s] range based on a factor that . . . [was] not authorized under section 3553(b)," 18 U.S.C. § 3742(e)(3)(B)(ii), and further set out the following additional requirements:

> The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations [that the district court failed to provide the written statement of reasons as required by section 3553(c) or that the sentence departs from the applicable Guidelines range based on a factor that, in pertinent part, is not authorized under section 3553(b)], shall give due deference to the district court's application of the [G]uidelines to the facts. With respect to determinations [that the district court failed to provide the written statement of reasons as required by section 3553(c) or that the sentence departs from the applicable Guidelines range based on a factor that, in pertinent part, is not authorized under section 3553(b)], the court of appeals shall review de novo the district court's application of the [G]uidelines to the facts.

Id. § 3742(e) (emphasis added). The remedial majority determined that excision of this provision was necessary because it contained "critical cross-references" to the provision rendering the Guidelines mandatory. Booker, 543 U.S. at 260. Despite excising the

---

[27] The remedial opinion was joined by Chief Justice Rehnquist and Justices O'Connor, Kennedy, and Ginsburg.

-15-

applicable scope of review, the Court found that the standard of "reasonableness" was implicit in the review process—a "standard consistent with appellate sentencing practice during the last two decades." Id. at 261-62.[28]

### D.  The 2005 Amendments to Tennessee's Sentencing Statutes

Following Blakely and Booker, Governor Phil Bredesen charged a Task Force with drafting legislation that would address any constitutional problems with Tennessee's sentencing laws in light of the United States Supreme Court's rulings. Raybin, 41 Tenn. B.J. at 14.[29]  The General Assembly subsequently amended the 1989 Act in an effort to bring our sentencing scheme into compliance with the constitutional interpretations in those cases. See, e.g., Hearing on S.B. 2249 Before the S. Comm. on the Judiciary, 2005 Leg., 104th Gen. Assemb. (Tenn. 2005) (statement of Sen. Joe Haynes); Hearing on H.B. 2262 Before the H. Comm. on Fin. Ways & Means, 2005 Leg., 104th Gen. Assemb. (Tenn. 2005) (statement of Rep. Joe Fowlkes) (noting that the bill would change Tennessee's sentencing laws to comply "with the Blakely case, and about two or three other cases that have been decided since that time"); see also Act of June 7, 2005, ch. 353, 2005 Tenn. Pub. Acts 788 (codified at Tenn. Code Ann. § 40-35-210 (2006)).[30]

Prior to the effective date of these amendments, however, this Court decided Gomez I, 163 S.W.3d at 632, which addressed the constitutionality of the pre-2005 sentencing scheme. In Gomez I, the defendants asserted and the State agreed that the imposition of maximum sentences based upon the trial court's finding of enhancement factors was in contravention of the ruling in Blakely. 163 S.W.3d at 654.  Nevertheless, this Court upheld the sentences. Id. at 661.  While acknowledging that "Blakely itself include[d] language which c[ould] be broadly construed" as supportive of the defendants' position, id. at 658, this Court found that the opinion "drew a constitutionally significant distinction between judicial factfinding in a 'determinate' sentencing scheme and judicial factfinding in an 'indeterminate' sentencing scheme," id. at 656, and read Booker as "instruct[ing] . . . that the Sixth Amendment is not implicated by a sentencing procedure which uses non-binding, advisory enhancement factors to inform and to guide the judge's selection of an appropriate sentence in the statutory range authorized by the jury's verdict." Id. at 657.  The Court found that the 1989 Act "afford[ed] judges discretion to select an appropriate sentence within a predetermined statutory range" but did not give judges the "authority to impose a sentence outside the statutory range." Id. at 659.  "Significantly," the Court noted, "no provision in

---

[28] Before 2003, the Court noted that appellate review of sentencing, as defined by statute, looked to whether the sentence was "unreasonable." Id. at 261.

[29] Mr. Raybin was an advisor on the Governor's Task Force. Id.

[30] The details of the 2005 amendments are discussed infra.

the . . . Act mandate[d] an increase in a defendant's sentence upon the finding of an enhancement factor." Id. at 658. Because the "relevant constitutional inquiry [was] not whether a judge exercise[d] sentencing discretion by finding facts, but rather whether the judge's finding of a fact mandate[d] an increased sentence," this Court concluded that the 1989 Act did not implicate the Sixth Amendment concerns as articulated in Apprendi, Blakely, and Booker. Id. at 661.[31]

Two months after Gomez I was decided, the General Assembly passed the 2005 amendments to Tennessee's sentencing statutes. As under the 1982 and 1989 Acts, the 2005 amendments required trial courts, when determining the sentence and "the appropriate combination of sentencing alternatives that shall be imposed on the defendant," to consider the following:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;[32]

---

[31] Justice Anderson, in partial dissent joined by Justice Birch, would have ruled that the 1989 Act "d[id] not pass constitutional muster under Apprendi, Blakely, and Booker." Id. at 667 (Anderson, J., concurring in part and dissenting in part). In their view, the applicable sentencing schemes in both Blakely and Booker mandated that "the sentencing judge was not free to impose a sentence anywhere within the statutory range," but instead specified a "'base' or 'standard' range as the starting point," and then either required (per the federal Guidelines addressed in Booker) or allowed (per the Washington statute addressed in Blakely) the judge, upon the finding of aggravating factors, to increase the sentence beyond the standard range. Id. at 664. Justices Anderson and Birch read Blakely to hold that, under the Apprendi standard, "the base range or standard range" was the applicable statutory maximum for Sixth Amendment purposes, i.e., "'the maximum [the judge] may impose without any additional facts.'" Id. (quoting Blakely, 542 U.S. at 303-04). Although noting that Blakely, and particularly Booker, reaffirmed and reiterated that it was not constitutionally impermissible for a sentencing judge to use facts not found by the jury to sentence a defendant "within the *appropriate range*," id. at 665, the partial dissent observed that the majority had ignored the fact that Tennessee's sentencing scheme set a presumptive sentence for each felony class within each range, comparable to the "base range of the federal Guidelines and the standard range" in Washington's statute. Id. at 665-66. In light of the fact that the Washington statute struck down in Blakely was "effectively the same" as Tennessee's Act, in that "[i]t mandated a 'standard range' based upon the jury's verdict and then permitted, *but did not require*, a judge to enhance the defendant's sentence in response to judicially-determined enhancement factors," Justices Anderson and Birch would have held our sentencing scheme unconstitutional. Id. at 667.

[32] The enhancement factors were also rendered completely advisory by the 2005 amendments. See
(continued...)

-17-

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010). The only significant addition to these factors was subsection (6), which one commentator observed was meant "[t]o avoid 'sentence creep' . . . [and was] designed to assist trial and appellate judges in assessing sentences in individual cases," which would "alert [them] to local jurisdictions that drastically deviate from the norm." Raybin, 41 Tenn. B.J. at 20.

Most significantly, however, the 2005 amendments "remove[d] the prior rule, that absent an enhancement factor, a judge may not impose a sentence that exceeds the presumptive sentence at the bottom of the range (or in the middle of the range for Class A felonies)" and instead allowed "the judge [to] sentence anywhere within the appropriate range." Id. at 16. Accordingly, Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.
(d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

---

[32](...continued)
Act of June 7, 2005, ch. 353, § 5, 2005 Tenn. Pub. Acts 788, 789 (codified at Tenn. Code Ann. § 40-35-114 (2006) (stating that "[i]f appropriate for the offense and if not themselves an essential element of the offense, the court shall consider, but is not bound by, the following advisory factors in determining whether to enhance a defendant's sentence") (emphasis added)).

Tenn. Code Ann. § 40-35-210(c)–(d) (2010) (emphasis added). Reflecting the General Assembly's intent to bring our sentencing scheme into compliance with Blakely and Booker, this amendment to section 40-35-210 rendered advisory the minimum sentence and the enhancement and mitigating factors that might be considered in the imposition of a sentence within the appropriate sentencing range, thereby eliminating the "presumptive sentence" under the 1989 Act.[33] Raybin, 41 Tenn. B.J. at 16; see also Carter, 254 S.W.3d at 343. Nevertheless, trial courts were still required under the 2005 amendments to "place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(e) (2010).

In addition, the 2005 amendments no longer allowed for an appeal to be taken based on a trial court's improper weighing of enhancement and mitigating factors. Provisions were added, however, allowing an appeal to be taken by the defendant on the basis that the sentence was either "not imposed in accordance with this chapter"; "excessive under" the purposes or principles of sentencing in Tennessee Code Annotated sections 40-35-102 and -210; or "inconsistent with" the sentencing purposes and principles at sections 40-35-102 and -103. Id. § 40-35-401(b)(1)–(3). An appeal by the State could be taken if, in pertinent part, the sentence was "inconsistent with" the purposes and principles articulated in sections 40-35-102 and -103. See id. § 40-35-402(b)(7). Whether a sentence was appealed by a defendant, see id. § 40-35-401(d), or the State, see id. § 40-35-402(d), the 1989 Act, as amended, continued to provide for de novo appellate review "with a presumption that the determinations made by the court from which the appeal is taken are correct." Id. §§ 40-35-401(d), -402(d).

Two years after the passage of the 2005 amendments, the United States Supreme Court explicitly approved Tennessee's statutory changes as constitutionally sound. See Cunningham v. California, 549 U.S. 270, 294 n.18 (2007). At the same time, the high Court

---

[33] The 2005 amendments did not, however, make our sentencing ranges advisory. Raybin, 41 Tenn. B.J. at 16 ("The new legislation makes no changes to the existing sentencing ranges of punishment that are determined by the number and types of prior convictions. What has changed is the manner of fixing the length of sentence within the range."); see also Tenn. Code Ann. § 40-35-210(c) (2010) ("The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career or repeat violent offender." (Emphasis added)). In this regard, our 2005 amendments differ from the Guidelines and Booker, which allow federal district courts to impose sentences outside of the applicable Guidelines range. We emphasize that our 2005 amendments rendered advisory only "the minimum sentence within the range of punishment" and "the sentence length within the range" as adjusted by any applicable enhancement and mitigating factors. Tenn. Code Ann. § 40-35-210(c)(1)–(2) (2010) (emphasis added). The statutory sentencing ranges and the purposes and principles of sentencing remain mandatory. See id. § 40-35-210(a), (b)(3), (c).

vacated and remanded the ruling in Gomez I.[34]  See Gomez v. Tennessee, 549 U.S. 1190 (2007).  On remand, this Court "conclude[d] that the [1989] Act failed to satisfy the Sixth Amendment insofar as it allowed a presumptive sentence to be enhanced based on judicially determined facts."  State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007) ("Gomez II").

### E.  Recent Decisions

While addressing the constitutionality of the 1989 Act, Gomez II focused on the presumptive sentence and enhancement factors applied by the trial court, rather than the appellate standard of review.[35]  Since the passage of the 2005 amendments, this Court has not had the opportunity to specifically address the effect of Apprendi and its progeny on our form of appellate review, as retained by the 1989 Act.  Initially, however, three of our decisions since 2007 provide insight.

In Carter, this Court addressed the question of "how the 2005 revisions to the Criminal Sentencing Reform Act of 1989 impact the method of imposing a sentence."  254 S.W.3d at 337.  After Carter was convicted of vehicular homicide, the State introduced proof demonstrating that he qualified as a Range III persistent offender, which established a sentencing range of ten to fifteen years.  Id. at 340-41.  In mitigation, Carter presented evidence from the victim's mother "in which she asked the court to probate the . . . sentence and also offered several letters from other family members asking for leniency."  Id. at 340.

---

[34] Cunningham addressed the constitutionality of California's determinate sentencing law under which a trial judge could increase the presumptive sentence—in the defendant's case, the middle term of twelve years—if he or she found one or more aggravating factors by a preponderance of the evidence.  Id. at 275.  The trial judge found several aggravating factors and sentenced the defendant to the upper term of sixteen years.  Id. at 275-76.  The Court found that "the middle term prescribed in California's statutes, not the upper term, [was] the relevant statutory maximum," and the only means by which a trial judge could increase a defendant's sentence beyond this term was to find one or more aggravating circumstances that were not "[a]n element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea."  Id. at 288 (citation omitted).  The Court concluded, therefore, that the facts permitting the imposition of an upper-term sentence under California's statutes, which were found by the judge, rather than the jury, violated the Sixth Amendment.  Id. at 293.

[35] See Gomez II, 239 S.W.3d at 737 (applying plain error review, consistent with the finding in Gomez I that the defendants failed to preserve their constitutional claim for plenary appellate review).  Because Gomez II was heard on remand from the Supreme Court, our standard of appellate review under the 2005 amendments was not at issue.  As noted above, however, the remedial opinion in Booker found constitutional conflicts not only in the provision making the federal Guidelines mandatory, but also in the provision articulating the "standards of review on appeal, including *de novo* review of departures from the applicable Guidelines range."  Booker, 543 U.S. at 259.  Continuing to expound upon its holdings in Apprendi, Ring, Blakely, and Booker, the Supreme Court specifically addressed the appropriate standard of appellate review in Rita v. United States, 551 U.S. 338 (2007), and Gall v. United States, 552 U.S. 38 (2007).  We discuss these cases infra in more detail, after surveying the relevant cases from our own state.

The trial court determined that a sentence of "ten years, time served, probated" was appropriate. Id. at 341. On appeal, the Court of Criminal Appeals modified the sentence to fifteen years, the maximum permitted in the range, which precluded the grant of probation. Id. at 342.

This Court reinstated the ten-year sentence as set by the trial court and ordered that the sentence be served in the Department of Correction. Id. We observed that the post-2005 version of the Act "no longer impose[d] a presumptive sentence," but instead allowed the trial court the discretion "to select any sentence within the applicable range so long as the length of the sentence [wa]s 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d) (2006)). We noted that neither a defendant nor the State, under the amended Act, could appeal a sentence on the grounds that the trial court had not properly weighed the enhancement and mitigating factors. Id. at 344. We further noted that the Act still provided for a de novo review "'on the record of the issues . . . conducted with a presumption'" that the trial court was correct, id. (quoting Tenn. Code Ann. § 40-35-401(d) (2006)):

> [T]he presumption of correctness "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails. In that event, "our review is simply de novo."

Id. at 344-45 (citations omitted).

We pointed out in Carter that the Court of Criminal Appeals' ruling that the trial court "failed to appropriately adjust the sentence length due to the presence of enhancement factors and . . . based the sentence on a mitigating factor not supported by the proof . . . indicate[d] that the court disagreed with the trial court's weighing of the various enhancement and mitigating factors before it." Id. at 345 (internal quotation marks omitted). We noted, however, that this "disagreement [wa]s not grounds for reversal under the revised Sentencing Act," id., and concluded that if a sentence is consistent with the purposes and principles of the Act, appellate courts "do not have the authority [to increase a defendant's sentence] upon the basis of a trial court's 'fail[ure] to appropriately adjust' a sentence in light of applicable, but merely advisory, mitigating or enhancement factors." Id. at 346. We then emphasized that because these factors were rendered advisory by the 2005 amendments, the trial courts have been afforded broader discretion in sentencing determinations:

-21-

Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, <u>it does not abuse its discretion if it does not increase the sentence beyond the minimum</u> on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, <u>it does not abuse its discretion if it does not reduce the sentence from the maximum</u> on the basis of those factors. <u>The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.</u>

<u>Id.</u> at 345-46 (emphasis added). Although we expressed discomfort with the trial court's imposition of the minimum sentence, we found that "the trial court did not go so far astray under the 2005 expansion of discretion as to render the sentence reversible." <u>Id.</u>[36]

Our next case touching on the subject of appellate review was <u>State v. Banks</u>, 271 S.W.3d 90, 145 (Tenn. 2008). In this capital case involving multiple crimes and multiple issues on appeal, Banks challenged twenty-five-year sentences imposed by the trial court for attempted first degree murder and especially aggravated robbery. <u>Id.</u> Addressing the propriety of the length of these sentences, we stated that "[w]hen reviewing a sentence, an appellate court must review the record de novo and must presume that the determinations made by the court from which the appeal is taken—in this case the Court of Criminal Appeals—are correct." <u>Id.</u> More importantly, however, and in recognition of the increased discretion given to trial courts as a result of the 2005 amendments, this Court upheld the sentences despite the fact that the trial court had erroneously relied upon two enhancement factors. <u>Id.</u> at 147. Because "the trial court considered and weighed all the matters that [Tennessee Code Annotated section] 40-35-210 required it to consider and [because] the four remaining enhancement factors more than adequately support[ed] the trial court's discretionary decision to impose twenty-five[-]year sentences for the[] two crimes," the sentences were upheld. <u>Id.</u>

Most recently, in <u>State v. Cross</u>, 362 S.W.3d 512, 517 (Tenn. 2012), the defendant was convicted of evading arrest while creating a risk to others, reckless endangerment with a deadly weapon, driving on a revoked license, and speeding. Cross contended that the trial

---

[36] We held, however, that the presumption of correctness did not apply to the trial court's decision to place the defendant on probation because "[a]pparently, the trial court gave no consideration to the previous unsuccessful attempts to rehabilitate the [d]efendant through measures less restrictive than confinement, a significant factor in th[e] case because the [d]efendant was on release status from multiple prior felony sentences when he committed the instant offenses." <u>Id.</u> at 348. Upon applying a de novo standard of review, we determined that the defendant had failed to "carr[y] his burden of establishing his suitability for probation and ha[d] not established that the suspension of his sentence serve[d] the ends of justice or the best interest of the public." <u>Id.</u>

court had inappropriately determined that he "'had no hesitation about committing a crime when the risk to human life was high.'" Id. at 527 (quoting Tenn. Code Ann. § 40-35-114(10) (2010)). We held that "[e]ven if this enhancement factor should not have been considered, the sentences imposed by the trial court were not excessive," and made the following further observation:

> While the precise metes and bounds of appellate review under the current increased trial court discretion structure have not yet been fully defined, some markers are fairly clear. An improper consideration of an enhancement factor or factors will not necessarily invalidate the sentence when a trial court imposes a sentence after considering and weighing the principles and purposes of sentencing set forth in [Tennessee Code Annotated section] 40-35-210. To the contrary, when a trial court has sentenced in accordance with these principles and another enhancement factor or factors adequately support the trial court's decision, the reviewing court will leave the decision entrusted to the discretion of the trial court undisturbed.

Id. at 529 (emphasis added). Because the trial court had "emphasized a variety of considerations beyond the enhancement factors which [were] consistent with the principles and policies of sentencing" and had "also placed appropriately significant weight on two other [applicable] enhancement factors," we held that "[t]hese considerations more than adequately justif[ied] the trial court's sentencing decision." Id. at 529-30.

Several points can be gleaned from these three decisions. First, we have consistently recognized that the 2005 amendments significantly increased a trial court's discretionary authority in imposing sentences. See, e.g., Carter, 254 S.W.3d at 344 (observing that "the 2005 revision[s] . . . increase[] the amount of discretion a trial court exercises when imposing a sentencing term"). Second, even when we have found a misapplication of enhancement factors or have otherwise expressed disagreement with the sentence, we have upheld the exercise of discretion by the trial courts unless they have "departed so far from the Sentencing Act" or "go[ne] so far astray under the 2005 expansion of discretion as to render the sentence reversible." Id. at 346; see also Cross, 362 S.W.3d at 529-30. Finally, we have held that the "improper consideration of an enhancement factor . . . will not necessarily invalidate the sentence." Cross, 362 S.W.3d at 529.

Our rulings since 2007 parallel the efforts of the federal courts to develop an appropriate standard of appellate review. Since its ruling in Cunningham, the United States Supreme Court has primarily directed its attention to the remedial opinion in Booker—that is, the mode by which appellate courts review sentencing decisions under the federal Guidelines. The rationale of these opinions is instructive. For example, in Rita v. United

States, 551 U.S. 338, 341 (2007), the question presented was whether appellate courts could presume that a sentence imposed within a properly calculated range was reasonable. In that case, a defendant was convicted of perjury, id. at 342, and sentenced by the trial court "at the bottom of the Guidelines range." Id. at 345. On appeal, the defendant sought a downward departure contending that his sentence was "unreasonable." Id. The Fourth Circuit Court of Appeals concluded that "a sentence imposed within the properly calculated Guidelines range . . . is presumptively reasonable" and upheld his sentence. Id. at 345-46 (internal quotation marks omitted). The Supreme Court agreed, holding that the "presumption of reasonableness [applies] to a . . . sentence that reflects a proper application of the Sentencing Guidelines," id. at 347, and noting that "the presumption reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case." Id. The Court further observed that such a presumption "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [federal sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." Id. at 350-51.

In Rita, the Court also addressed whether the district court had properly analyzed the relevant sentencing factors and, more specifically, whether the judge had adequately "'state[d] in open court the reasons for [his] imposition of the particular sentence'" as required by statute. Id. at 356 (quoting 18 U.S.C. § 3553(c) (2000 & Supp. IV)). While describing the judge's statement as "brief" and suggesting that typically a sentencing judge "should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority," the Court ruled that a district "judge decid[ing] simply to apply the Guidelines to a particular case . . . will not necessarily require lengthy explanation." Id. at 356-57. Although the defendant had argued for a sentence less than the recommended Guidelines sentence based on his poor health, his "fear of retaliation in prison, and [his] military record," the Court found the record "clear" that these factors had been considered by the judge and that the Fourth Circuit properly concluded that the sentence imposed by the district court was not unreasonable. Id. at 358.

Later, in Gall v. United States, 552 U.S. 38 (2007), the United States Supreme Court elaborated on the nature of appellate review in the federal system:

> Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly

calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.[37]

Gall, 552 U.S. at 51 (emphasis added). In applying this abuse of discretion standard, the Supreme Court instructed the federal appellate courts to consider "the totality of the circumstances, including the extent of any variance from the Guidelines range." Id. While the appellate courts could "consider the extent of the deviation" from the Guidelines range, the high Court cautioned that the district court's decision "that the § 3553(a) factors, on a whole, justif[ied] the extent of the variance" was entitled to deference. Id. The Court reiterated its holding in Rita that for sentences within the Guidelines range, appellate courts "may, but [are] not required to, apply a presumption of reasonableness." Id. (citing Rita, 551 U.S. at 347). The Court then reversed the ruling of the Eighth Circuit Court of Appeals because it had "engaged in an analysis that more closely resembled de novo review of the facts presented and determined that, in its view, the degree of variance [from the sentence suggested by the Guidelines] was not warranted." Id. at 57.[38]

---

[37] Justice Scalia, writing separately in Rita, would have held that this "reasonableness review cannot contain a substantive component at all," 551 U.S. at 370 (Scalia, J., concurring in part and concurring in the judgment), based upon his belief "that there will inevitably be *some* constitutional violations under a system of substantive reasonableness review, because there will be some sentences that will be upheld as reasonable only because of the existence of judge-found facts." Id. at 374. Instead, Justice Scalia would have "limit[ed] reasonableness review to the sentencing *procedures* mandated by statute." Id. at 381. This would allow an appellate court to "reverse a district court that: appears not to have considered § 3553(a); considers impermissible factors; selects a sentence based on clearly erroneous facts; or does not comply with § 3553(c)'s requirement for a statement of reasons." Id. at 382.

[38] Also decided that same term was Kimbrough v. United States, 552 U.S. 85, 90 (2007), in which the Court dealt with the disparity between the Guidelines' suggested sentences for crack and powder cocaine offenses. As noted by the Court, under the Guidelines, "a drug trafficker dealing in crack cocaine is subject to the same sentence as one dealing in 100 times more powder cocaine." Id. at 91. The Fourth Circuit held that the district court's sentence, which was outside the range suggested by the Guidelines, was "per se unreasonable [because] it [wa]s based on a disagreement with the sentencing disparity for crack and powder cocaine offenses." Id. at 93 (internal quotation marks omitted). The Court reversed, concluding that "under Booker, the cocaine Guidelines, like all other Guidelines, are advisory only," and that although "[a] district judge must include the Guidelines range in the array of factors warranting consideration," he or she "may determine . . . that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objective of sentencing." Id. at 91 (quoting 18 U.S.C. § 3553(a) (2000 & Supp. V)). Accordingly, the

(continued...)

While Rita and Gall addressed the effect of Booker's remedial opinion on appellate review under the federal Guidelines, Tennessee's General Assembly, according to at least one authority, elected to "Booker-ize" its own sentencing statutes;[39] that is, it chose to make Tennessee's minimum sentences and enhancement and mitigating factors advisory only, adopting an approach similar to that taken by the Supreme Court in Booker as to the federal Guidelines. Thus, the Supreme Court's reasoning in these cases, while providing no bright line rule,[40] lends some guidance in addressing the issue in the case before us.

---

[38](...continued)
Court found that the district court's original sentence was "reasonable" in light of the considerations contained in § 3553(a). Id. at 110-11.

In Spears v. United States, 555 U.S. 261 (2009) (per curiam), the Court reiterated its ruling in Kimbrough. There, the district court deviated from the Guidelines' "100:1 ratio between powder cocaine and crack cocaine quantities" for purposes of sentencing, finding that adherence to this ratio would yield an excessive sentence. Id. at 261-62. Instead, the district court chose to sentence the defendant to the statutory mandatory minimum. Id. at 262. The Eighth Circuit, after having its initial reversal of the sentence vacated and remanded in light of the Court's decision in Kimbrough, id. at 262-63, again reversed and remanded for resentencing, holding that the district court could "not categorically reject the ratio set forth by the Guidelines." Id. at 263 (internal quotation marks omitted). The Court yet again reversed, finding that the Eighth Circuit's holding conflicted with Kimbrough, which it found to undoubtedly hold "that with respect to the crack cocaine Guidelines, a categorical disagreement with and variance from the Guidelines is not suspect." Id. at 264.

[39] Pfaff, 93 Marq. L. Rev. at 685-86.

[40] Some scholars have been critical of the Court's foray into this area. See, e.g., Frank O. Bowman, III, Debacle: How the Supreme Court Has Mangled American Sentencing Law and How It Might Yet Be Mended, 77 U. Chi. L. Rev. 367, 460 (2010) (observing that the "tangle of rules and exceptions [articulated by the Supreme Court's sentencing cases] is obviously neither simple nor . . . logical"); Pfaff, 93 Marq. L. Rev. at 715 ("In Booker, the Supreme Court awkwardly attempted to restore the substantive appellate review of criminal sentences after effectively destroying such review less than a year earlier in Blakely. The result is confusing and contradictory, since the Court attempted this restoration while simultaneously upholding its decision in Blakely."). But see Amy Barons-Evans & Kate Stith, Booker Rules, 160 U. Pa. L. Rev. 1631, 1672 (2010) (arguing that "Booker has been transformative simply by permitting the courts to communicate with the [U.S. Sentencing] Commission (and with each other) in a transparent and effective manner," resulting in the "revis[ion of] a number of [G]uidelines" and "persuad[ing] Congress to revise its own unsound policies").

Similarly, there are disagreements among the various justices as to what, in fact, post-Booker appellate review entails. Compare Rita, 551 U.S. at 365 (Stevens, J., concurring) (disagreeing with Justice Scalia's position based on his belief that "purely procedural review . . . is inconsistent with our remedial opinion in Booker, which plainly contemplated that reasonableness review would contain a substantive component"), with id. at 368 (Scalia, J., concurring in part and concurring in the judgment) (disagreeing that reasonableness review was substantive in nature, but was instead procedural), and id. at 391 (Souter, J.,

(continued...)

We begin by observing that this Court has continued in recent years to recognize our pre-2005 standard of appellate review, which conditions the presumption of correctness afforded the trial court's sentencing decision on "the affirmative showing in the record that [it] considered the sentencing principles and all relevant facts and circumstances." Ashby, 823 S.W.2d at 169. Although nothing in the statute requires that the presumption of correctness be conditional, if trial courts fail altogether to place on the record any reason for a particular sentence, the appellate courts would be forced to conduct a de novo review.[41] Mere inadequacy in the articulation of the reasons for imposing a particular sentence, however, should not negate the presumption. As the Supreme Court noted in Rita, while "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority," there is no requirement that such reasoning be particularly lengthy or detailed. 551 U.S. at 356-57. Accordingly, while a trial court's less comprehensive findings may require appellate courts to more carefully review the record, sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed.

In addition, since the 2005 amendments, we have often recited language that the presumption of correctness fails when a trial court applies inappropriate enhancement or mitigating factors. See, e.g., Carter, 254 S.W.3d at 345. For several reasons, that is no

---

[40](...continued)
dissenting) (stating that he would "reject the presumption of reasonableness adopted in this case" because "[o]nly if sentencing decisions are reviewed according to the same standard of reasonableness whether or not they fall within the Guidelines range will district courts be assured that the entire sentencing range set by statute is available to them").

[41] And while we are not faced with a set of circumstances in which no reasons were given in the record, we note that the trial court is in a superior position to impose an appropriate sentence and articulate the reasons for doing so. While we have the statutory authority to modify the sentence, see Tenn. Code Ann. §§ 40-35-401(c)(2), -402(c) (2010), the more appropriate course of action under such circumstances may be to remand to the trial court. See id. §§ 40-35-401(c)(3), -402(c). For example, in State v. Dailey, No. M2007-02548-CCA-R3-CD, 2008 WL 3343004, at *4 (Tenn. Crim. App. Aug. 11, 2008), the Court of Criminal Appeals observed that "the trial court did not place on the record, either orally or in writing, what specific findings it made when sentencing the defendant" and remanded the case for a new sentencing hearing because the appellate court was "unable to conduct a proper de novo review." Although our holding today replaces the presumption of correctness and de novo standard of review with a presumption of reasonableness and abuse of discretion standard, we continue to agree that appellate courts cannot properly review a sentence if the trial court fails to articulate in the record its reasons for imposing the sentence. Therefore it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e): "When the court imposes a sentence, it shall place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." (Emphasis added).

longer the case. First, as indicated previously, nothing in the 1989 Act requires that the presumption be conditional. Second, mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal. Third, the 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence.

Moreover, the lead opinion of the Court of Criminal Appeals, in this instance, after properly recognizing the misapplication of the single enhancement factor, determined that only a minimum sentence could be imposed. Bise, 2011 WL 4090792, at *9. That holding would serve to establish by case law that which cannot be done by statute. That is, to hold that only the minimum sentence may be imposed absent a finding by the trial judge of an enhancement factor would, in our view, violate the ruling in Blakely. See Bise, 2011 WL 4090792, at *11 (Woodall, J., concurring) (arguing that "the majority, by implication, is holding that the defendant's sentence in this case cannot be increased above the minimum unless the trial court finds applicable an enhancement factor that is not a prior conviction" which, "[i]n effect, . . . obviously violates Blakely"); cf. Pfaff, 93 Marq. L. Rev. at 694 ("To reverse [a sentence] because . . . the trial court relied on an improper aggravator would imply that the guidelines are not wholly voluntary . . . and thus would trigger Blakely's concerns about jury rights.").

We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld. In consequence, the Sentencing Commission Comment to Tennessee Code Annotated section 40-35-210, which provides that "[t]he court must begin the sentencing determination at the statutory minimum which is called the 'presumptive sentence' under subsection (c) [and i]f there are no enhancement or mitigating factors, then the court must impose the minimum sentence within the appropriate range," is in conflict with Blakely and the 2005 amendments and should, therefore, be disregarded.

In light of this holding, we think it is now appropriate to address the question we have previously left unresolved by defining "the precise metes and bounds of appellate review under the current increased trial court discretion structure." Cross, 362 S.W.3d at 529. Although our decisions in Carter and Banks recited the statutory standard as de novo with a presumption of correctness, we upheld each of the defendant's sentences by recognizing the broad discretion afforded trial courts by the 2005 amendments. See Banks, 271 S.W.3d

at 147; Carter, 254 S.W.3d at 344, 346. Later, in Cross, we explicitly recognized the lack of clarity in the scope of appellate review post-2005. 362 S.W.3d at 529. The confusion may be attributable to the fact that the 2005 amendments did not address the de novo standard of review, which the United States Supreme Court has abrogated in favor of a reasonableness standard. See, e.g., Booker, 543 U.S. at 261 (observing that in light of its decision to make the Guidelines advisory, "the reasons for [the de novo standard of review]—to make Guidelines sentencing even more mandatory than it had been—ha[d] ceased to be relevant"). Furthermore, application of a purely de novo standard of review is inconsistent with the recent holdings of the Supreme Court, which have explicitly rejected de novo review in the context of sentencing. See, e.g., Gall, 552 U.S. at 56 (noting that "[a]lthough the Court of Appeals correctly stated that the appropriate standard of review was abuse of discretion, it engaged in an analysis that more closely resembled de novo review of the facts presented and determined that, in its view, the degree of variance [from the Guidelines] was not warranted"). In our view, Carter marked the beginning of this Court's recognition that sentences should be reviewed under an abuse of discretion standard. In Banks and Cross, we also afforded greater deference to the sentences imposed by the trial court. Thus, although the statutory language continues to describe appellate review as de novo with a presumption of correctness, our recent decisions have more closely resembled an abuse of discretion standard. We hold, therefore, that because the General Assembly, in an effort to bring the 1989 Act into compliance with Apprendi, Blakely, and Booker, made advisory the minimum sentence that should be imposed and the enhancement and mitigating factors that might be considered, the 2005 amendments also effectively abrogated the de novo standard of appellate review. So as to comport with the holdings in Booker, Rita, and Gall, today we adopt an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act.

Our conclusion that a presumption of reasonableness should be afforded to a sentence within the appropriate statutory range is further supported by the standard of appellate review in effect at the time juries imposed sentences. See, e.g., Carroll v. State, 370 S.W.2d 523, 531 (Tenn. 1963) ("The punishment imposed, though severe, was authorized by law. Where the punishment imposed by the jury was within the limits allowed by the law, it cannot be said that their verdict indicated passion, prejudice or caprice upon their part."); Johnson v. State, 598 S.W.2d 803, 806 (Tenn. Crim. App. 1979) ("Finally, we find no merit to the defendants' attack on the sentences assessed by the jury. The punishment in each instance is fully supported by the evidence and falls with[in] the range authorized by statute, and therefore cannot be considered 'excessive.'"). Thus, our decision today not only brings the 1989 Act, as amended in 2005, into compliance with the recent decisions of the United States Supreme Court, it also is consistent with our long-standing deference to the sentence imposed in the trial court.

The presumption of reasonableness applies to the sentence imposed by the trial court. Previously, we have stated that in our review of a sentence, our Court of Criminal Appeals is entitled to a presumption of correctness. See Banks, 271 S.W.3d at 145. The literal language of the statute supports this construction. See Tenn. Code Ann. §§ 40-35-401(d), -402(d) (stating that "[t]he review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct"). Read in context, however, we believe that the statute contemplates the application of the presumption to the determinations made by the trial court. First, the 1989 Act, as amended, primarily addresses the role of trial courts in the imposition of sentences. Second, the provisions governing appellate review state that the defendant or the State "may appeal from the length, range or the manner of service of the sentence imposed by the sentencing court," Tenn. Code Ann. § 40-35-401(a) (emphasis added); see also id. § 40-35-402(a), implying that any appellate review is of the decision of the court that actually imposes the sentence. Finally, the 2005 amendments served to increase the discretionary authority of trial courts in sentencing. In other areas of law in which a trial court is afforded wide discretion, review is of the propriety of the decision by the trial court, not that of the intermediate appellate court. See, e.g., State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012) (observing that a trial court's findings of fact during a suppression hearing are binding on this Court unless the evidence preponderates against them); cf. Mitchell v. Fayetteville Pub. Utils., 368 S.W.3d 442, 447 (Tenn. 2012) (reviewing the trial court's findings of fact "de novo upon the record . . . accompanied by a presumption of the correctness of the finding" (internal quotation marks omitted)). We hold, therefore, that the presumption of reasonableness—which we adopt to replace the presumption of correctness—is more properly applied to the sentence imposed by the trial court.

In summary, the 2005 amendments to the 1989 Act were intended to bring our sentencing scheme in line with the decisions of the United States Supreme Court in this area. Accordingly, when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the "presumption of correctness" ceased to be relevant. Instead, sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a "presumption of reasonableness."

## II. The Sentences

As we apply these principles to the sentences at issue, we first observe that the Court of Criminal Appeals properly ruled that the evidence does not support the single enhancement factor applied by the trial court. When imposing the sentences, however, the trial court did give consideration to the contents of the pre-sentence report. The Defendant had a prior conviction for public intoxication. The trial court expressed particular concern that the Defendant's intoxication played a role in her convictions on each of the three counts

and that she had failed to provide her son with appropriate parental guidance during the episode that led to the convictions. Furthermore, the trial court gave consideration to the fact that the Defendant had knowingly allowed stolen goods to be stored in her home for an extended period of time. See Tenn. Code Ann. § 40-35-102. While observing that the Defendant might be amenable to rehabilitation, the trial court expressed the need for deterrence of crimes of this nature. The State submitted proof of an unusually high number of burglaries in Greene County. See id. § 40-35-102(3)(A); cf. State v. Hooper, 29 S.W.3d 1, 10 (Tenn. 2000) (holding that this Court "will presume that a trial court's decision to incarcerate a defendant based on a need for deterrence is correct so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes").[42] Here, there was specific testimony at the sentencing hearing that four hundred burglaries had been committed in Greene County in the previous year alone. The trial court also noted that the Defendant had allowed her son to store the stolen items in her home for many months. This Court has previously noted that trial courts, "familiar with their locale and having seen the evidence and the defendant, as well as possessing the benefit of experience in sentencing matters, should retain that discretion necessary to achieve all of the purposes of the [Sentencing] Act." Moss, 727 S.W.2d at 237.[43] Because these qualify as sound reasons for the imposition of three-year sentences, the

---

[42] In Hooper, we articulated five non-exclusive factors to guide the trial court in the decision of whether to impose incarceration based on a need for deterrence: (1) "[w]hether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole"; (2) "[w]hether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior"; (3) "[w]hether the defendant's crime and conviction ha[d] received substantial publicity beyond that normally expected in the typical case"; (4) "[w]hether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective"; and (5) "[w]hether the defendant ha[d] previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions." Id. at 10-12. We noted, however, that the trial court "need not find . . . all of these factors" prior to ordering incarceration and, further, that the trial court could rely on other factors so long as they were supported "by at least some proof" and were noted specifically in the record. Id. at 12.

[43] Similarly, the Supreme Court has observed as follows:

The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record. The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the . . . appeals court. Moreover, [d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do.

(continued...)

presumption of reasonableness prevails and we do not find that the trial court abused its sound discretion by imposing these within-range sentences.

### Conclusion

We hold that a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision. A sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute. Notwithstanding the trial court's reliance on an erroneous enhancement factor, we hold that its imposition of three-year sentences was supported by the reasons articulated in the record. We therefore reverse the Court of Criminal Appeals and reinstate the sentence of the trial court. It appearing that the Defendant is indigent, costs are adjudged against the State.

_____
GARY R. WADE, JUSTICE

---

[43](...continued)

Gall, 552 U.S. at 51-52 (citations omitted) (internal quotation marks omitted).