IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 28, 2014 Session

## STATE OF TENNESSEE v. SARAH REBEKAH HODGES

**Appeal from the Criminal Court for Washington County**
**Nos. 38023, 37513, 37511      Robert E. Cupp, Judge**

_____

**No. E2013-00553-CCA-R3-CD - Filed March 12, 2014**

_____

The defendant, Sarah Rebekah Hodges, appeals from her Washington County Criminal Court guilty-pleaded convictions of eight counts of forgery, one count of theft of property valued at more than $10,000 but less than $60,000, and one count of theft of property valued at more than $1,000 but less than $10,000, claiming that the trial court erred by denying her bid for judicial diversion and by denying full probation. We discern no error in the trial court's denial of judicial diversion and full probation, but we observe plain error in seven of the defendant's judgments for forgery. In case number 37513, the trial court attempted to memorialize the defendant's guilty pleas and the accompanying sentences for all seven counts of forgery contained in the indictment within a single judgment form. Because a separate judgment form is required for each conviction, case number 37513 is remanded to the trial court for entry of a separate judgment form for each conviction of forgery.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Steven R. Finney (on appeal); and Donna Bolton (at trial), Johnson City, Tennessee, for the appellant, Sarah Rebekah Hodges.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Janet Hardin, District Attorney General *pro tem*; and Erin McArdle, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Charged in case number 37511 with one count of forgery; in case number

37513 with one count of theft of property valued at $10,000 or more but less than $60,000 and seven counts of forgery; and in case number 38023 with one count of theft of property valued at $1,000 or more but less than $10,000, the defendant pleaded guilty to all the charges on June 18, 2012, in exchange for a five-year effective sentence with the manner of service to be determined by the trial court. At the plea submission hearing, the defendant indicated an intent to seek judicial diversion. Upon questioning by the trial court, the defendant acknowledged that she had taken checks and jewelry from the home of her best friend, Emmalea Johnston, over the course of several months. She then sold the jewelry and forged the checks to obtain money with which to buy Oxycontin.

At the sentencing hearing, the trial court noted that it would be considering both the "issue of alternative sentencing and possibly diversion which is not an alternative sentence." The court noted that a number of letters had been submitted on the defendant's behalf and that court records indicated that the defendant's court costs, which totaled $7,266.00, had been paid in full. The defendant had also paid $1,105.00 in restitution. The trial court complemented the defendant for paying the costs before the hearing.

The defendant testified that she became pregnant and married while a young woman. The relationship, she said, was "physically and verbally abusive." She said that as a result of that relationship and the stress of "everyday life," she turned to prescription pain killers as a "coping mechanism." The defendant said that she had known the victim "for a very long time," that the two had gone to school together, that she was the maid of honor at the victim's wedding, and that the two "were very, very close." The victim had no idea of the defendant's drug problem and, as a result, trusted the defendant to watch her dogs and to babysit her stepdaughter. The defendant said that she violated the victim's trust by stealing jewelry and checks from the victim's home. She then used the money to purchase pain killers.

The defendant testified that when the thefts were discovered, she and her grandmother "went to every single place" where the defendant had sold the victim's jewelry in an attempt to recover it, but they were not able to recover any of the jewelry. She said that she and her grandmother went to the victim's house "trying to give them money . . . to help or make the situation better." The defendant said that the situation had "been a completely humbling experience" that led her to be "more comfortable in [her] true self." The defendant testified that she had assisted investigators to the best of her ability and that she had entered an intensive, outpatient drug treatment program. She said that she had been drug-free for 15 months.

The defendant testified that as a result of the offenses, her ex-husband, who had only sporadic contact with her daughter, had sought full custody of the little girl. The

defendant said that her family had been very supportive. She apologized to the victim and thanked those who had supported her.

During cross-examination, the defendant acknowledged that following her arrest she had spent less than two hours in jail before her grandparents posted her bond. The defendant admitted that the victim had been her best friend since the age of five and that she was aware that the victim's mother died when the victim was six years old. She said that she knew that some of the jewelry she stole from the victim's home had belonged to the victim's mother. The defendant admitted that she stole 25 checks from the victim and the victim's husband and that she made notations at the bottom of each check. She said that those notations were "a big, like cry for help because [she] knew that it was going to be caught." Despite these notations, she made each of the checks payable to herself. She said that writing the notations "made [her] feel a whole lot easier knowing that [she] was taking money from [her] best friend and [her] husband." She explained, "I wrote that for my own self to not feel as bad, that way if when they did find out, that I would just say that I needed money for school so I could still continue." The defendant acknowledged that she stole some of the victim's jewelry on the victim's wedding day when the victim asked her to retrieve the victim's make-up bag from the house. She said that on each occasion that she stole jewelry, neither the victim nor her husband was home. She admitted that she stole checks and jewelry over the course of at least a month.

The defendant testified that no one confronted her until the victim telephoned the defendant's new husband to let him know that the defendant had written checks on their accounts. She said, "Then that's when they realized, I guess, the jewelry as well."

During redirect examination, the defendant asked the court for judicial diversion because she did not want her "life to be completely ruined." She explained, "I have goals, I have dreams, I have a child who I want to look up to me and to not just see me as a convicted felon and someone who will never be able to do anything."

Upon questioning by the court, the defendant acknowledged that she had never asked for or stolen money from her grandparents, who had posted her bond following her arrest. She said that taking things from the victim "was just easy, it was fast." The defendant said that she had not told her daughter about the offenses because "she's right now a little too young," but she said that she had "told her that mommy has made many decisions, some good ones and some bad ones." She said that she had not been in drug treatment for nearly a year. She said that she only "occasionally" attended addiction-related meetings. The court expressed concern that the defendant believed she was "home-free."

David Lay, the defendant's father, testified that he was proud of the defendant

for being honest and overcoming her addiction. He apologized to the victim and said that he "hope[d] at some point in time all this stuff will be a bad memory and it will go away."

The victim, Emmalea Johnston, testified that she became a friend of the defendant when the two were young. Her mother died when she was five, and her father gave her pieces of her mother's jewelry at various points in her life. She said that he told her to "cherish it and keep it forever and hand it down to" her own children. The victim said that during the defendant's "stealing extravaganza," "there was more jewelry available than there usually was" because she had taken some items out of a safe deposit box to wear and use at her wedding. The victim said that because she was busy planning her wedding and starting a new job, she gave the defendant access to her home to help out.

The victim testified that on October 6, 2011, she checked the bank statement for her husband's corporation and discovered several checks made out to the defendant. She said that she was initially angry with her husband because she believed that he had written checks to the defendant to help her out. She said that she telephoned her husband at work, and the two realized that the defendant had taken the checks. She said that they decided to "confront the situation and maybe just see like what's going on" and to see whether the defendant needed help. The victim said that she telephoned the defendant's current husband, who told her about the defendant's drug problem. The defendant's husband said, "'You better check your jewelry box because I bet it's cleaned out.'" She said that she immediately checked her jewelry box and discovered that the jewelry was missing.

The victim testified that a total of 25 checks were drawn on accounts belonging to the victim and her husband. She recalled that, in addition to the checks and the jewelry, some expensive clothing belonging to her six-year-old step-daughter was missing. The victim said that she and her husband would have done "anything [they] could have" to help the defendant. She said that she believed the defendant preyed on them because she believed that her crimes "would have just been excused or overlooked" because of their friendship. The victim testified that her husband was a doctor and that she was a nurse practitioner, and they had "any and all capabilities to do whatever [the defendant] needed" them to do for her. She said, "[W]e could have gotten her in anywhere or done anything."

At the conclusion of the hearing, the court observed that the defendant's taking 25 checks and several items of jewelry over the course of some months indicated "a sustained intent to violate the law over a period of time." The court also noted, however, that it was troubled by the defendant's exploitation of her friendship with the victim. Regarding whether the grant of judicial diversion would "serve the interest of the public as well as the accused," the court found "it a stretch when the [c]ourt would try to grant diversion to someone who committed not one time but thirty (30) violations of that trust." The court

found that the defendant's sustained intent to violate the law and her abuse of a position of trust weighed "heavily against granting diversion to her." The trial court concluded that the defendant was amenable to correction and that her physical and mental health and social history weighed in her favor. Balancing these factors, the trial court denied the defendant's request for diversion.

The trial court concluded, however, that a sentence of total confinement was not appropriate. Accordingly, the trial court placed the defendant on probation and ordered her to attend "treatment sessions" as a condition of her probation. The trial court also ordered the defendant to serve 30 days in confinement "to reinforce the fact that you never want to do this again in your life." The court stated that the defendant would be permitted to serve the 30 days' confinement "around work release" and that she could even serve her time on the weekends. The court made it clear, however, that the confinement was necessary to reinforce to the defendant the magnitude of her crime.

In this appeal, the defendant challenges the trial court's denial of judicial diversion and full probation. We consider each claim in turn.

## I. Judicial Diversion

"Judicial diversion" is a reference to the provision in Tennessee Code Annotated section 40-35-313(a) for a trial court's deferring proceedings in a criminal case. *See* T.C.A. § 40-35-313(a)(1)(A). Pursuant to such a deferral, the trial court places the defendant on probation "without entering a judgment of guilty." *Id.* To be eligible or "qualified" for judicial diversion, the defendant must plead guilty to, or be found guilty of, an offense that is not "a sexual offense or a Class A or Class B felony," and the defendant must not have previously been convicted of a felony or a Class A misdemeanor. *Id.* § 40-35-313(a)(1)(B)(i)(b), (c). Diversion requires the consent of the qualified defendant. *Id.* § 40-35-313(a)(1)(A).

Eligibility, however, does not automatically translate into entitlement to judicial diversion. *See State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000). The statute states that a trial court may grant judicial diversion in appropriate cases. *See* T.C.A. § 40-35-313(a)(1)(A) (citing that court "may defer further proceedings"). Thus, whether an accused should be granted judicial diversion is a question entrusted to the sound discretion of the trial court. *Bonestel*, 871 S.W.2d at 168.

"Tennessee courts have recognized the similarities between judicial diversion and pretrial diversion and, thus, have drawn heavily from the case law governing pretrial

diversion to analyze cases involving judicial diversion." *State v. Cutshaw*, 967 S.W.2d 332, 343 (Tenn. Crim. App. 1997). Accordingly, the relevant factors related to pretrial diversion also apply in the judicial diversion context. They are:

> [T]he defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation and amenability to correction, as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that [judicial] diversion will serve the ends of justice and best interests of both the public and the defendant.

*Id.* at 343-44; *see also State v. Washington*, 866 S.W.2d 950, 951 (Tenn. 1993). Moreover, the record must reflect that the trial court has weighed all of the factors in reaching its determination. *Bonestel*, 871 S.W.2d at 168. The trial court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others. *Id.*

On appeal, this court must determine whether the trial court abused its discretion by failing to grant judicial diversion. *Cutshaw*, 967 S.W.2d at 344; *Bonestel*, 871 S.W.2d at 168. Accordingly, when a defendant challenges the denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. *Cutshaw*, 967 S.W.2d at 344; *Bonestel*, 871 S.W.2d at 168.

Turning to the denial of diversion in this case, the record establishes that the trial court considered all the appropriate factors in making its ruling. The court concluded that although the defendant's amenability to correction, her physical and mental health, her lack of a criminal record, and her social history weighed in favor of a grant of judicial diversion, her sustained intent to violate the law and her abuse of a position of trust weighed "heavily against her." Balancing these considerations, the trial court concluded that judicial diversion would not serve the interests of the defendant or the public. In our view, the record supports the findings of the trial court. The defendant stole 25 checks and several items of jewelry from her life-long best friend over the course of at least a couple of months. She exploited the victim's trust to gain access to the victim's home and property, and she took many of the items of jewelry without regard for the fact that they belonged to the victim's deceased mother and could not be replaced. The defendant even went so far as to steal from her best friend while performing her duties as maid of honor in the victim's wedding. Under these circumstances, the trial court did not abuse its discretion by denying judicial diversion

in this case.

## II. Full Probation

The defendant also contends that the trial court erred by ordering that she serve 30 days of her five-year sentence in confinement rather than granting her full probation. The State contends that the trial court did not err by imposing the short period of incarceration.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

The imposition of a five-year sentence in this case mandated the trial court's considering probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Traditionally, however, the defendant has born the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "'subserve the ends of justice and the best interest[s] of both the public and the defendant.'" *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956)), *overruled on other grounds by Hooper*, 29 S.W.3d at 9-10. Recently, however, the supreme court expanded the holding in *Bise* to the trial court's decision regarding probation eligibility, ruling "that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the

questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d at 278-79.

Here, the record establishes that the trial court considered the purposes and principles of the sentencing act when ordering the defendant to serve 30 days' incarceration. The trial court placed particular emphasis on the circumstances of the offense and the need to impress upon the defendant the seriousness of the offenses in this case. Importantly, the defendant had spent less than two hours in jail in connection with the offenses in this case. The trial court noted its particular concern that the defendant had stopped attending any drug treatment at all, cautioning the defendant, "You're not home free, young lady, if you think that you've overcome the addiction." In our view, the trial court did not err by denying a sentence of full probation in this case.

### III. Judgment Errors

Although we find no error in the sentencing decision of the trial court, we find plain error in the judgment forms for the defendant's convictions of forgery in case number 37513. The defendant pleaded guilty to, and was convicted of, seven counts of forgery. The trial court, however, entered only a single judgment of conviction and noted in the "special conditions" portion of the uniform judgment form the separate conviction counts. Supreme Court Rule 17, which promulgates and requires the use of the uniform judgment document, provides, "The judgment should be prepared *for each conviction; if there are multiple convictions in the same indictment, separate judgments should be filled out* with appropriate notations stating whether the sentences will run consecutively or concurrently." Tenn. R. Sup. Ct. R. 17 (emphasis added). Consequently, the case must be remanded for the trial court to prepare a separate judgment form for each of the defendant's convictions of forgery in case number 37513.

### Conclusion

The record in this case supports the denial of judicial diversion and full probation, but the record shows plain error with regard to the judgment forms in case number 37513. Accordingly, the judgments of the trial court are affirmed, but case number 37513 is remanded for the entry of separate judgment forms for each conviction of forgery in that case.

_____
JAMES CURWOOD WITT, JR., JUDGE