IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 23, 2022

**STATE OF TENNESSEE v. DUSTIN RUSSELL**

**Appeal from the Circuit Court for Rhea County**
**No. 2020-CR-96     Thomas Graham, Judge**

_____

**No. E2021-01389-CCA-R3-CD**

_____

The defendant, Dustin Russell, appeals the trial court's imposition of a fully incarcerative sentence for his guilty-pleaded convictions of aggravated assault and reckless endangerment. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the appellant, Dustin Russell.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; J. Michael Taylor, District Attorney General; and David Shinn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Rhea County Grand Jury charged the defendant with five counts of aggravated assault by use of a deadly weapon, one count of reckless endangerment by use of a deadly weapon, and two counts of retaliation for past action for his actions on September 18, 2019. On July 16, 2021, the defendant pleaded guilty to one count of aggravated assault and one count of felony reckless endangerment in exchange for Range I, concurrent sentences of five years and two years, respectively, and dismissal of the remaining charges. The agreement provided for the trial court to determine the manner of service of the sentences.

The transcript of the guilty plea submission hearing was not included in the record on appeal. At the sentencing hearing, the prosecutor provided the following summary of facts:

If you recall, during the plea, as the facts were set out, this incident occurred out on Watts Bar Lake in an area that's commonly on the . . . Sand Mountain -- Sand Island area of the lake where there were some people recreating. It's a shallow sand bar where people kind of hang out out on the lake, and the defendant came in his boat and basically created some mayhem: assaulted, allegedly assaulted a couple, three other individuals, and then he got in his boat -- got back in his boat and circled around and drove his boat at a high rate of speed toward a family that really didn't have anything to do with anything that was on a pontoon boat, and it caused them to fear imminent bodily injury.

There was at least one young child on that pontoon boat, there were some teenage children, and a mother and father and a couple of other adults, if I recall correctly. So that's what this incident is.

The defendant's father, Dan Russell, testified that the defendant lived in Englewood but had worked for "several years" as a "foreman" "for a gas company in Pennsylvania." Mr. Russell stated that the defendant entered into drug and alcohol rehabilitation following the entry of the guilty pleas in this case and that "he's paying for that himself out of his own pocket." Mr. Russell said that, after his stint in rehabilitation, the defendant was "a changed person" and that the defendant had continued with outpatient counseling following his residential stay.

Mr. Russell testified that the defendant's mother passed away just before the offenses in this case, "and it really affected him real bad." He said that the defendant had "a daughter he put through college, and she graduated and started teaching school this year." Additionally, he said that the defendant had "changed a lot" since the birth of his grandson. He stated that the defendant had "been real good" since the offenses, adding that "[h]e works out of state about [10] months out of the year anyway. He usually works two months at a time up there on his job before he even comes in."

During cross-examination, Mr. Russell testified that the defendant's mother died in June 2018, more than a year before the offenses. He acknowledged that the defendant had used drugs in the past and that he had previously displayed a violent temper.

The court asked Mr. Russell where the defendant had lived between the ages of 18 and 27, noting that the defendant had "16 violent convictions -- variations of assault

-2-

and resisting arrest, things like that -- over the period of time since he was 27." Mr. Russell said that the defendant had lived in Louisiana periodically while working on an offshore oil rig.

The defendant testified that he had resided primarily in Louisiana both as a child and following his release from prison in 2007. He admitted that he racked up numerous criminal convictions from 1999 to 2007 when he "was in full-blown addiction." He returned to McMinn County in 2013 and bought a house in Englewood. He said that he "went through a pretty nasty divorce" in 2017 "and just . . . backslid" thereafter. When questioned by the court about the circumstances of the offenses in this case, the defendant said, "I ate so many pills that day, Your Honor, and drank a bunch of Jim Beam and stuff, and saw a guy that we were seeing the same girl and got into a fight with him, and then just basically, after his friends jumped in, everything just went south . . . ." He acknowledged a tendency to become violent when using drugs and alcohol.

The defendant said that he had attended drug rehabilitation after entering his pleas in this case and had learned "ways to structure my life" to avoid using drugs and alcohol. He testified that he had "110 days clean" and that he attended weekly outpatient therapy even when he was "on a rig." He said that he had paid $15,000 out-of-pocket for his 30-day inpatient treatment. He explained that his job took him to Pennsylvania for months at a time. He said that he had not "missed a day of work in over seven years, or been late." The defendant testified that he planned to continue that work should he be granted an alternative sentence and that his income would allow him to pay all his probation fees and costs.

The defendant testified that he had a good relationship with his adult daughter and infant grandson. He said that he owned his home in Englewood and planned to stay there when he was not working in order to be close to his daughter and grandson. He also said that he planned to continue attending outpatient therapy.

During cross-examination, the defendant acknowledged that before entering drug and alcohol rehabilitation, he was abusing methamphetamine and Valium. He said that he did not "use any drugs when I was at work ever. Only when I got home and my mind was idle." The defendant admitted that he pleaded guilty to the domestic assault and false imprisonment of his father in 2007 but explained that it was "a best-interest plea. I didn't do anything." He said that he agreed to plead guilty because he was told, "'Three years probation, you could walk today,' and I was gone." He agreed that he had been convicted of more than 20 offenses, 16 of which "involve[d] some type of assaultive or violent behavior." He said, "[B]ack then happened, but I'm not that man today."

The State asked the trial court to order the defendant to serve his sentence in confinement, citing the defendant's lengthy criminal record and trouble with sentences involving release into the community. The defendant asked for some form of alternative sentencing, noting that he had accepted responsibility for his crimes, had attended rehabilitation at his own expense, had held a steady job for years, and had strong family relationships. He asked that he be released into the community to "continue with his rehabilitation, to continue to support his family, and to continue to be the type of person . . . that's of benefit and valuable to society."

The trial court observed that the defendant's was "one of the worst records" and noted that "the presentence report is so replete with violent conduct, you know, that there's nothing positive that I can gain from the presentence report." The court described "the defendant's physical and mental condition and social history" as "not good" "over his lifetime." The trial court found that "[t]he circumstances of the case" and the "[p]revious actions and character of the defendant" were "not particularly helpful." The court found that the risk that the defendant might reoffend was "very high in this case." The court noted that the defendant had only had one revocation despite having been sentenced to probation many times but nevertheless concluded that the previous probationary sentences had not "kept him from committing the subsequent crimes that are involved here." The trial court found that placing the defendant on probation "certainly is not a deterrent for others to commit if all they ever get is probation. He's had probation 15 to 20 times already in his life." The trial court denied all forms of alternative sentencing and ordered the defendant to serve his five-year effective sentence in confinement.

The defendant appeals the sentencing decision of the trial court, arguing that the court abused its discretion by ordering a fully incarcerative sentence. The State asserts that the trial court did not err.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.*

at 709.  The abuse-of-discretion standard of review and the presumption of reasonableness also applies to "questions related to probation or any other alternative sentence."  *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

When a trial court orders a fully-incarcerative sentence, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1):

> (1) Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

T.C.A. § 40-35-103(1).

The defendant is to be commended for completing drug and alcohol rehabilitation, maintaining steady employment, and taking care of his family.  That being said, we cannot conclude that the trial court abused its discretion by denying alternative sentencing in this case.  The trial court was particularly concerned with the defendant's long history of criminal conduct, which was, as the trial court found, "replete with violent conduct."  Moreover, although the record establishes that the defendant was generally successful at completing sentences involving release into the community, the fact that the defendant continued to engage in the same conduct even after completing probation suggests a lack of amenability to correction.

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE