IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 18, 2025

## STATE OF TENNESSEE v. CHARLES RANDOLPH CARTER

**Appeal from the Criminal Court for Knox County**
No. 123974          Hector I. Sanchez, Judge

_____

### No. E2024-01855-CCA-R3-CD

_____

The Defendant, Charles Randolph Carter, appeals the trial court's revocation of his probationary sentence stemming from his guilty-pled convictions for attempted aggravated assault and aggravated cruelty to animals. While on probation, the Defendant absconded from supervision and committed new misdemeanor offenses, among other violations. Following several revocation hearings, the trial court revoked the Defendant's three-year and eight-month probationary sentence and ordered him to serve the balance in confinement. On appeal, the Defendant argues that the trial court abused its discretion (1) by determining that he violated his probation based upon disciplinary infractions committed while in custody on this sentence and (2) by fully revoking his probation given his contrition and need for additional drug treatment. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which TOM GREENHOLTZ and STEVEN W. SWORD, JJ., joined.

Mary J. Newton, Knoxville, Tennessee, for the appellant, Charles Randolph Carter.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Helen Evan, Assistant Attorney General; Charme P. Allen, District Attorney General; and Sean Roberts, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

On March 6, 2023, the Defendant pled guilty to two counts of attempted aggravated assault involving separate victims and one count of aggravated cruelty to animals. *See* Tenn. Code Ann. §§ 39-12-101, -13-102, -14-212. The trial court imposed an effective sentence of four years in split confinement—four months to serve and the remainder of three years and eight months suspended to supervised probation.[1] Also, in the judgment forms, the trial court ordered that "the Defendant shall have no contact with [the victims] (including no assaultive behavior)." Kayla Shelby, a probation and parole officer with the Tennessee Department of Correction ("TDOC"), began to supervise the Defendant after he was placed on probation following his guilty plea.[2]

### A. Supervision History Prior to the Instant Revocation

Following his release on probation, the Defendant participated in treatment with "CCS."[3] When Officer Shelby called CCS on June 13, 2023, she was informed that the Defendant had successfully completed treatment and that he had been discharged on May 16, 2023. When the relevant databases "did not reveal any new addresses to check" for the Defendant's whereabouts, officers attempted a home visit on June 27, 2023, to the Defendant's last-listed address. There they came into contact with the Defendant's sister, who informed them that the Defendant did not live at the residence. A violation of probation warrant ("VOP warrant") was filed on July 6, 2023,[4] which alleged that the Defendant had absconded and that his whereabouts were unknown. The warrant noted that this was the Defendant's first violation of probation.

---

[1] Neither the guilty plea transcript nor the guilty plea paperwork appears in the technical record on appeal.

[2] We compile the summary of the Defendant's supervision history that follows from several different sources in the appellate record: numerous documents prepared by Officer Shelby, particularly, the September 24, 2024 violation of probation report; Officer Shelby's testimony in this matter; and the trial court's minute entries and orders.

[3] This acronym is not defined in the appellate record and likely refers to Comprehensive Community Services, an inpatient treatment facility located in Kingsport, Tennessee.

[4] When the dates provided by Officer Shelby in the September 24, 2024 violation of probation report differ from the dates that appear on documents in the technical record, we will utilize the dates that appear on the documents.

The Defendant failed to report for intake on July 11, 2023, and he was ultimately arrested on the VOP warrant in early August 2023. Following his arrest, the VOP warrant was amended on August 9, 2023, to include a new charge of violating an order of protection (offense date July 18, 2023), a Class A misdemeanor. The VOP warrant alleged that the Defendant had engaged in "assaultive, abusive, threatening or intimidating behavior and behaved in a manner that pose[d] a threat to others or himself." Thereafter, on September 6, 2023, the Defendant, with the assistance of counsel, "submit[ted] to the [VOP] Warrant" and received a ninety-day sanction. On October 10, 2023, the Defendant was released on his own recognizance and ordered to reside at a local halfway house called Integrity House.

When Officer Shelby later received an October 20, 2023 discharge letter from Integrity House, which stated that the Defendant had been given medication from another resident and then refused a drug screen on that date, the VOP warrant was again amended to reflect the violation of failure to comply with the trial court's order. Thereafter, the Defendant appeared in court on November 15, 2023, and he was administered a drug screen. At that time, the Defendant tested positive for "amphetamine, methamphetamine, buprenorphine, [MDMA], fentanyl, and [THC,]" which led to his being taken into custody. On November 30, 2023, the Defendant "submit[ted] to the [VOP] Warrant" and "the no contact order [was] amended to reflect no further trouble or assaultive behavior with the victim."

On January 5, 2024, the Defendant was released on his own recognizance and transported to CCS to participate in treatment, which was to be followed by his placement in Irongate Recovery, a halfway house. Officer Shelby received a letter on February 6, 2024, stating that the Defendant had been successfully discharged from CCS and admitted into Irongate. The "Petition for Revocation of Probation" that was still pending "came on for a hearing" and was dismissed on February 9, 2024. On February 13, 2024, the Defendant reported for intake, and he tested negative for prohibited substances at that time.

B.     Supervision History Surrounding the Instant Revocation and Related Proceedings

When officers attempted a home visit at Irongate on February 20, 2024, they were informed that the Defendant had been discharged due to "testing positive for fentanyl, opiates, and alcohol." The Defendant did not inform his probation officers of his discharge, and when an attempt was made to contact the Defendant, it was discovered that the phone number he had provided was not in service. When the relevant databases "did not reveal any new addresses to check" for the Defendant's whereabouts, a second VOP warrant was issued on February 28, 2024. The warrant charged the Defendant with violations of (1)

- 3 -

Rule 5 by failing to contact probation after being discharged from Irongate and failing to have a working phone number, (2) Rule 6 by absconding, (3) Rule 8 by testing positive for illegal substances while at Irongate, and (4) Rule 10 by failing to abide by the trial court's order to reside at Irongate. Thereafter, the Defendant failed to report for a Strong-R assessment on March 1, 2024.

After the Defendant was served with the VOP warrant, the warrant was amended on March 25, 2024, to include a violation of Rule 1 due to the Defendant's obtaining a new charge for unlawful possession of drug paraphernalia on March 16, 2024, a Class A misdemeanor. On April 11, 2024, the Defendant "submit[ted] to the [VOP] Warrant" and was "referred to the Knox County Mental Health Court for a post-sentence investigation and report."[5] The case was continued until May 17, 2024, and on that date, the trial court referred the Defendant "to the Day Reporting Center with the State Probation Office."[6] The case was again continued. Later, on July 2, 2024, pursuant to an order of the trial court, the Defendant was "referred to the Knox County Detention Facility's [ITP[7]] Program for evaluation," and if accepted, he was "to enroll in said program until successful completion." Thereafter, the VOP warrant was amended three times—in July, August, and September of 2024—to reflect disciplinary infractions committed by the Defendant while in custody.

The VOP warrant was first amended on July 26, 2024, to include generally "inmate disciplinary infractions" on the part of the Defendant, and his disciplinary history from the Knox County Sheriff's Office was attached. Based upon this new allegation, a hearing occurred on August 7, 2024, during which Lieutenant Samantha Hill and the Defendant testified.

Lt. Hill supervised the disciplinary and grievance division at the Knox County detention facility. She affirmed her familiarity with the process of adjudicating a disciplinary infraction in the jail and described said process. She stated that, at the conclusion of any disciplinary hearing, the hearing officer immediately recorded the results of that hearing in the inmate's disciplinary history. She indicated that this recordation was

---

[5] This information is reflected in the trial court's minute entry from this date. However, no transcript from this proceeding is included in the appellate record.

[6] Once again, this information is reflected in a minute entry from the trial court, but no transcript is included in the appellate record.

[7] This acronym is not defined in the appellate record and likely refers to the Knox County Sheriff's Office's Intensive Treatment Program.

a regularly conducted activity of her office, noting that it was part of her office's responsibility to maintain such records, that the records were accessible through the "jail records management system," and that physical copies were retained for ten years.

Lt. Hill was asked to discuss some of the Defendant's "recent disciplinary infractions." The State also sought to introduce into evidence the Defendant's disciplinary records from Knox County. The defense objected to the introduction of the records based upon grounds of hearsay, arguing that the records were being offered for the truth of the matter asserted therein. The defense also objected to Lt. Hill's testimony on confrontation grounds. The trial court ruled that Lt. Hill could testify generally about the contents of the Defendant's disciplinary records given that she was the keeper of those records, which were admissible under the business records exception to the hearsay rule. *See* Tenn. R. Evid. 803(6). However, Lt. Hill was not permitted to discuss the conduct that gave rise to the disciplinary infractions because she was not a witness with personal knowledge and there had not been good cause shown for the absence of such a witness.

In accordance with this ruling, Lt. Hill testified that the Defendant "had a disciplinary [infraction] that occurred on August 2nd of this year, in which he was written up for theft and tampering with a food cart." She continued, "His disciplinary hearing on that matter was held on the 6th, in which he pled guilty and was found guilty for that matter[.]" Lt. Hill then testified that the Defendant had also been adjudicated guilty in March 2024 of a "Handbook Rule violation," in April 2024 of theft, in May 2024 of "posing as another inmate and theft," and in July 2024 of "unauthorized presence or absence from place of assignment."

The trial court inquired of Lt. Hill, "Has [the Defendant] ever pled guilty to any of these offenses in front of you?" Lt. Hill answered, "He was seen in my office for theft and tampering with a food cart, to which he pled guilty. I was present for that. Guilty plea." Lt. Hill agreed that the August 2 infractions were only "minor disciplinary" infractions.

From the Defendant's disciplinary records, introduced as a collective exhibit, it appears that, following a disciplinary hearing on August 6, 2024, the Defendant was adjudicated guilty for theft and tampering with a food cart based upon actions committed on August 2, 2024. Also, contained in the records are an "Incident Report Form" and a "Disciplinary Offense Violation Report," both of which were prepared by the reporting officer, Hunter Davis. Officer Davis notes therein that he "witnessed [the Defendant] take a[n] extra tray from the food cart as it was exiting the pod" and that the incident could be viewed on footage from the detention facility's camera. The Defendant's signed "Advisement of Rights for a Disciplinary Hearing" related to the August 6 hearing is also

included within this exhibit. A document titled "Disciplinary Hearing Results" indicates that the Defendant entered a guilty plea to both charges at the August 6 hearing and received a seven-day sanction prohibiting him from utilizing commissary benefits and telephone and messaging privileges.

The Defendant testified regarding his time on probation just before the February 28, 2024 VOP warrant was filed. He stated that he had enjoyed his time in inpatient treatment at CCS, which he successfully completed in February 2024, before transferring to Irongate. According to the Defendant, this was his first time completing the CCS program.[8] While residing at Irongate, on February 20, 2024, he found out that his mother was possibly sick with cancer. This led to his relapse and positive drug screen when he returned to Irongate later that day. The Defendant, now expelled from Irongate, knew he still needed help with his drug addiction, so he checked himself into Peninsula, an inpatient mental health facility, immediately thereafter. According to the Defendant, he was discharged from Peninsula four days later, and he then enrolled in Arbor Heights halfway house. The Defendant testified that he worked at a local Waffle House during this time; that he kept in contact with his probation officer, who told him to "take care of the violation"; and that he also reached out to his attorney. He asserted that he "was trying to set up [his] assessment appointment . . . to get back on track." The Defendant requested that he be permitted to reenter another treatment facility because "that's what [he] need[ed]."

Ultimately, the trial court found that the Defendant violated the conditions of his probation by a preponderance of the evidence. In reaching this conclusion, the trial court noted Lt. Hill's testimony regarding the Defendant's five disciplinary infractions since his incarceration in March 2024 and that she was present on one occasion when the Defendant pled guilty to two of those infractions.

The trial court then addressed the second step of its revocation decision—the appropriate consequence to be imposed. The trial court stated that it "count[ed] five revocations, three of which [the Defendant] submitted to." Citing Tennessee Code Annotated section 40-35-311, the trial court observed that, given this was the Defendant's fourth violation, it had discretion to revoke his probation in full. The trial court then stated that it would give the Defendant the opportunity "to show . . . that [he was] serious about some treatment[.]" The trial court concluded,

---

[8] This is contrary to Officer Shelby's testimony at the subsequent hearing and to the information contained in the September 24, 2024 probation violation report prepared by Officer Shelby that indicated the Defendant successfully completed CCS in May 2023.

What I would like to do, given his mental health issues, this Court has obviously been put on notice that he does struggle and he does continue to use drugs. If he wants to show this Court that he's serious, then he's going to successfully complete ITP. If he doesn't do that or if he gets another disciplinary [infraction] while he's confined, then it will be another very short revocation proceeding and he will serve his sentence in the [TDOC].

The case was continued.

Following the August 7 hearing, the VOP warrant was again amended on August 28, 2024. This time, the VOP warrant specifically stated that the Defendant had committed disciplinary infractions on August 2 of theft and tampering with a food cart. It also added new infractions allegedly perpetrated on August 16 of (1) attempt to possess or use illegal drugs or drug paraphernalia and (2) "reckless endangerment or attempt." Thereafter, on September 26, 2024, the warrant was again amended—this time to reflect disciplinary infractions committed on September 23 of "Possession or Distribution of Pharmacy Administered or OTC Commissary Medication or Attempt and Possession or Use of Dangerous Contraband." Another hearing ensued in the trial court on November 13, 2024, during which Officer Shelby and Lt. Hill testified.

Officer Shelby confirmed her familiarity with the terms and conditions of the Defendant's probation as his supervising officer. Officer Shelby stated that, "in [the Defendant's] situation since he was already in custody," the disciplinary infractions were "automatically considered a zero tolerance" violation. She noted that this zero tolerance classification was in accordance with the TDOC's "sanction matrix." As a collective exhibit, the State introduced into evidence a September 24, 2024 violation of probation report that was prepared by Officer Shelby, which detailed the Defendant's history of supervision; the September 26, 2024 order amending the VOP warrant to include the September 23 disciplinary infractions; and the TDOC Notice of Sanction informing the Defendant of the zero tolerance nature of the violation based upon the September 23 disciplinary infractions.

Officer Shelby also detailed the Defendant's prior supervision history, noting that he had twice received treatment through CCS, which he completed successfully on both occasions. She also recounted the Defendant's history of prior probation violations, which included absconding, violating an order of protection, being discharged from a halfway house in violation of a court order to reside there, obtaining a new charge for possession of unlawful drug paraphernalia, and committing disciplinary infractions while in custody. As for the Defendant's reporting while on probation, Officer Shelby affirmed that the

Defendant did contact probation after the home visit to his sister's residence in June 2023 and then again after he was expelled from the halfway house in February 2024. However, she also noted that the Defendant otherwise failed to report, attending only his February 2024 intake appointment, failing to attend his Strong-R assessment, and failing to comply with four home visits. When she was asked if probation would be willing to work with the Defendant going forward, she replied that the Defendant "would have to show that he [could] do it because he[ had] not shown that so far."

Lt. Hill again testified about her job duties in the disciplinary office of the Knox County detention facility and her responsibilities in the jail. An updated copy of the Defendant's disciplinary history while incarcerated in Knox County was entered as an exhibit to Lt. Hill's testimony. The defense did not lodge any objection to the records "[f]or the purpose of establishing that it's a disciplinary history" but noted it was not "agree[ing] to" the substance of the allegations contained therein.

Lt. Hill then testified about the disciplinary infractions that occurred on September 23, 2024. She confirmed that, based upon the Defendant's conduct on that date, he was charged with "possession or distribution of pharmacy administered or over-the-counter medication" and "the possession or use of dangerous contraband." The Defendant was "adjudicated as guilty" with regard to both disciplinary infractions, on October 1 and October 3, 2024, respectively. Lt. Hill acknowledged that she was not the officer who initially charged the Defendant with these infractions, and she could not recall any "specifics" of the Defendant's case without referring to a copy of the report. While she could not remember what medication was alleged to have been found in the Defendant's cell on September 23, she agreed that he was not charged with possessing an illegal drug based upon his conduct that day.

The State argued that the proof was sufficient to support a violation of the terms and conditions of the Defendant's probation, noting the recent disciplinary infractions and the trial court's instruction to the Defendant at the August 7 hearing not to incur any future infractions while incarcerated. The State asked for full revocation of probation based upon the Defendant's "rather lengthy history of violations." The defense argued that there was insufficient evidence to support the conclusion that he had violated the terms of his probation. Specifically, the defense contended that there was "no substantive proof" offered of the Defendant's conduct comprising the disciplinary infractions and that the adjudication of guilt by the disciplinary board was not enough, alone, to sustain the violation allegation. As for the consequence to be imposed, the defense noted that the Defendant had voluntarily sought mental health treatment with Peninsula after he was expelled from Irongate and that, following his release from Peninsula, he had reached out

to Officer Shelby "to get back on trac[k]." The defense asserted that the Defendant wanted "to be successful" and "turn his life around." Accordingly, the defense asked the trial court to sanction the Defendant with a short period of confinement and allow the Defendant to attend treatment and reapply to Drug Recovery Court.

The trial court first recounted Officer Shelby's testimony describing the Defendant's history of supervision, and the court emphasized the Defendant's discharge from Irongate on February 21, 2024, and "several violations during the pendency of his case." The trial court said, "pursuant to TDOC's sentencing[] matrix, allegations or offenses that occur while the defendant is already in custody amount to zero-tolerance violation[s]." The trial court then recounted Lt. Hill's testimony, noting that she was the keeper of the Knox County Jail's disciplinary records and that, in that capacity, she was able to discern that the Defendant was adjudicated guilty of the September 23, 2024 offenses. The trial court again found the Defendant "in violation of his probation" by a preponderance of the evidence based upon Lt. Hill's testimony.

As for the consequence to be imposed, the trial court determined that the Defendant's probation should be revoked in full because he had demonstrated that he was "not a suitable candidate for probation." The trial court reasoned,

> Unfortunately, for [the Defendant], I really did want to give you an opportunity to get some help. And I agree with [defense counsel] that you do need some help, and I kind of treated you differently as your case has been pending. The problem is I've given you four or five opportunities now that you've not taken advantage of whether it's putting you in a halfway house and you thereafter abscond or commit[] new offenses. And then while you're in custody, there's allegations of new offenses as well.

An order revoking the Defendant's probation in full was entered on November 14, 2024. The Defendant timely appealed.

## II. ANALYSIS

On appeal, the Defendant contends that the trial court erred (1) by finding him to be in violation of his probation based upon his acquiring "alleged disciplinary infractions" while in custody and (2) by revoking his probation in full. The State responds that the trial court did not abuse its discretion.

Appellate courts review a trial court's revocation of probation decision for an abuse of discretion with a presumption of reasonableness "so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." *State v. Dagnan*, 641 S.W.3d 751, 759 (Tenn. 2022). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). If a trial court fails to state its findings and reasoning for the revocation on the record, appellate courts may conduct a de novo review if the record is sufficiently developed, or the appellate court may remand the case for the trial court to make such findings. *Dagnan*, 641 S.W.3d at 759 (citing *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014)).

Probation revocation is a two-step consideration requiring trial courts to make two distinct determinations as to (1) whether to revoke probation and (2) what consequences will apply upon revocation. *Id*. at 757. No additional hearing is required for trial courts to determine the proper consequences for a revocation. *Id.* The trial court's findings do not need to be "particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." *Id.* at 759 (citing *State v. Bise*, 380 S.W.3d 682, 705-06 (Tenn. 2021)).

"The trial judge may enter judgment upon the question of the charges as the trial judge may deem right and proper under the evidence adduced before the trial judge." Tenn. Code Ann. § 40-35-311(d)(1). "If the trial judge finds by a preponderance of the evidence that the defendant has violated the conditions of probation and suspension of sentence, then the court may revoke the defendant's probation and suspension of sentence, in full or in part, pursuant to § 40-35-310." *Id*. Notwithstanding subdivision (d)(1), the probation statute provides for two categories of probation violations, technical and non-technical, with differing penalties for both. *State v. Rand*, 696 S.W.3d 98, 103 (Tenn. Crim. App. 2024).

The following are classified as non-technical violations: a defendant's commission of a new felony or a new Class A misdemeanor, a zero tolerance violation as defined by the TDOC community supervision matrix, absconding, or contacting the defendant's victim in violation of a condition of probation. Tenn. Code Ann. § 40-35-311(e)(2). Once a trial court determines that a defendant has committed a non-technical violation of probation, the trial court may: (1) order confinement for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period not exceeding one year; (4) return the defendant to probation on

- 10 -

appropriate modified conditions; or (5) resentence the defendant for the remainder of the unexpired term to a sentence of probation. *See id.* §§ -308(c); -310; -311(e)(2).

## A.    The Violation Determination

On appeal, the Defendant raises two issues with the trial court's application of the first step of *Dagnan*.  First, he argues that he was no longer on probation when the alleged infractions occurred because he "had already submitted to being in violation of his probation on April 11, 2024, and was in custody awaiting a determination of consequence." The State responds that this issue is waived because it has been raised for the first time on appeal and that the Defendant has not established his entitlement to plain error relief.  The Defendant replies, asserting that he is entitled to plain error relief if the issue is deemed waived.  Second, the Defendant submits that there was "a paucity of proof to establish" that he had committed the conduct which gave rise to the disciplinary infractions.  In this regard, the Defendant notes that Lt. Hill did not personally observe the conduct, nor could she testify to the particulars of the infractions.  The Defendant contends that his confrontation rights were violated because "there was no finding of 'good cause' to justify considering the disciplinary infractions without testimonial evidence of those infractions having been actually committed."  The Defendant further asserts that a finding of guilt in an administrative proceeding at the detention facility should not be considered tantamount to substantive proof of his conduct.  The State does not specifically respond to the Defendant's second issue.

Respectfully, the Defendant's arguments regarding the trial court's various findings surrounding the first step of *Dagnan*—whether to revoke probation based upon a violation—miss the mark.  The revocation process for this specific violation began on February 28, 2024, when the VOP warrant was filed.  That warrant charged that the Defendant violated the conditions of his probation due to his (1) failure to contact probation after being discharged from Irongate and failure to maintain a working phone number, (2) absconding, (3) testing positive for illegal substances while at Irongate, and (4) failing to abide by the trial court's order to reside at Irongate.  Thereafter, the Defendant failed to report for a Strong-R assessment on March 1, 2024.  The VOP warrant was amended on March 25, 2024, to include a violation based upon the Defendant's obtaining a new charge for unlawful possession of drug paraphernalia on March 16, 2024, a Class A misdemeanor.

Importantly, on April 11, 2024, the Defendant "submit[ted] to the [VOP] Warrant." The trial court's minute entry indicated that the Defendant was "referred to the Knox County Mental Health Court for a post-sentence investigation and report" and that the case was continued until May 17, 2024.  On May 17, 2024, following an in-court proceeding,

- 11 -

the trial court referred the Defendant "to the Day Reporting Center with the State Probation Office," and the case was again continued. Later, on July 2, 2024, pursuant to an order of the trial court, the Defendant was "referred to the Knox County Detention Facility's [ITP] Program for evaluation," and if accepted, he was "to enroll in said program until successful completion." Thereafter, the VOP warrant was amended three times—in July, August, and September of 2024—to reflect disciplinary infractions. The trial court held hearings regarding the disciplinary infractions in August and November 2024.

From this history, it is apparent that this was, at all times, an open revocation proceeding—that the Defendant was awaiting a consequence determination by the trial court as the court continued to seek avenues for the Defendant's further drug treatment. *See Dagnan*, 641 S.W.3d at 757 (stating that a separate hearing to determine the proper consequence for a revocation is not required but not foreclosing the possibility of such either). We confidently reach this conclusion as to the posture of this case despite some of the open-ended language and procedure utilized by the trial court in continuing to address the first step in the *Dagnan* process by finding the Defendant to be in violation of his probation based upon these disciplinary infractions. In fact, the Defendant makes such a concession in his appellate brief while presenting his in-custody argument: "[A]s [the Defendant] had already submitted to being in violation of his probation on April 11, 2024, and was in custody awaiting a determination of consequence, he was not on probation when the alleged infractions occurred." The trial court here was more than gracious in attempting to work with the Defendant regarding his substance abuse issues.

Thus, there should be little dispute about the trial court's application of the first step of *Dagnan*. The Defendant, on April 11, submitted to the VOP warrant, which included allegations of absconding and commission of a Class A misdemeanor. These are both non-technical violations. *See* Tenn. Code Ann. § 40-35-311(e)(2). The Defendant's stipulation to the allegations contained in the VOP warrant alone supports revocation. *See State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (concluding that the defendant's concession that he was a frequent user of marijuana while on probation supported the trial court's conclusion that a violation of probation occurred); *see also State v. Brewster*, No. E2021-00793-CCA-R3-CD, 2022 WL 2665951, at *4 (Tenn. Crim. App. July 11, 2022) (explaining that a defendant's stipulation to a probation violation supports revocation). Because consideration of the disciplinary infractions was unnecessary to support the trial court's decision that the Defendant had violated the terms of his probation, we decline to address the Defendant's detailed arguments in this regard.

B.      The Consequence Determination

As to the second step of *Dagnan*, the Defendant argues that the trial court abused its discretion by revoking his suspended sentence in full.  The Defendant submits that "[a]n incarcerative sentence is not proportionate to the allegations that [he] acquired disciplinary infractions while in custody, and given [his] ownership of his actions in February of 2024, an incarcerative sentence is not appropriate for those violations either."  According to the Defendant, his "behavior and contrition were not those of someone avoiding supervision or being unamenable to continued probation."  He notes that he submitted to the violation on April 11, 2024; that he "took ownership of his missteps"; that he stayed in touch with his probation officer; that he needed additional substance abuse treatment; and that Officer Shelby indicated "probation would take [him] back" if he displayed an aptitude for addressing such needs.

The State replies that the trial court acted within its discretion by ordering the Defendant to serve his full sentence in confinement.  The State notes that the Defendant had four new disciplinary infractions after his August 2024 revocation hearing; that the Defendant's supervision history includes multiple probation violations and disciplinary infractions; and that the trial court had already given the Defendant "four or five" opportunities on probation, but he refused to comply with the trial court's previous orders.

In issuing its ruling, the trial court noted that, after finding the violations occurred, it was tasked with determining the consequence for the violations.  "[T]he consequence determination essentially examines whether the beneficial aspects of probation are being served and whether the defendant is amenable to continued probation."  *Rand*, 696 S.W.3d at 106 (citation omitted).  Moreover, a trial court may, in determining the appropriate consequence for a probation violation, consider "the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character."  *Dagnan*, 641 S.W.3d. at 759 n.5.

Due to the non-technical nature of the violations, the trial court was statutorily authorized to order the Defendant to serve the remainder of his sentence in incarceration.  *See* Tenn. Code Ann. § 40-35-311(e)(2).  Stated another way, when a probationer commits a non-technical violation, the trial court's authority to impose a consequence is broad, and the court may fully revoke a suspended sentence even if the probationer has no history of prior violations.  *See id.*; *Rand*, 696 S.W.3d at 103-04.  The record in the present case reflects that the trial court appropriately analyzed the evidence and made sufficient findings regarding the facts and circumstances as they informed its decision concerning the appropriate consequence for the violations.  The facts recited by the trial court relative to

the number of violations, including absconding and commission of new crimes, and the Defendant's multiple failed attempts at drug treatment indicate that measures less restrictive than confinement were unsuccessful and reflect poorly on the Defendant's potential for rehabilitation. *See* Tenn. Code Ann. § 40-35-103(1)(C), (5).

The Defendant's supervision history as recounted by Officer Shelby is replete with drug usage, commission of new crimes, absconding, failure to abide by court orders, and failure to adhere to probation reporting requirements. The trial court offered the Defendant multiple chances at recovery in a drug treatment program despite the Defendant's repeated relapses, and the Defendant failed to comply with the trial court's orders in this regard on multiple occasions. *See State v. Penny*, No. W2023-00912-CCA-R3-CD, 2024 WL 1803264, at *4 (Tenn. Crim. App. Apr. 25, 2024) ("[R]ehabilitative efforts cannot be 'reasonably feasible' when the defendant does not voluntarily comply with those efforts. Thus, when a trial court weighs whether to continue rehabilitative efforts, it may certainly consider whether the defendant will voluntarily comply with the court's orders."), *perm. app. denied* (Tenn. Oct. 25, 2024). While incarcerated for his various probation violations, the Defendant was anything but a model prisoner. *See State v. Robinson*, No. E2024-00176-CCA-R3-CD, 2024 WL 4554688, at *4 (Tenn. Crim. App. Oct. 23, 2024) ("[T]he real purpose of the consequence determination is to reexamine the original decision to suspend the sentence and, through the lens of a defendant's post-judgment conduct, examine whether community-based efforts can still be effective for rehabilitation and community safety."), *no perm. app. filed*. Accordingly, we conclude that the trial court acted within its discretion when it ruled that the Defendant was no longer a good candidate for probation and should serve the remainder of his probationary sentence in incarceration. *See, e.g.*, *State v. Nelson*, No. M2023-00311-CCA-R3-CD, 2023 WL 6843541, at *5 (Tenn. Crim. App. Oct. 17, 2023) (affirming a trial court's decision to revoke probation in full after it had considered the defendant's past criminal history, which included his multiple violations of a past probationary sentence and his previous failed attempts at drug treatment), *perm. app. denied* (Tenn. Mar. 6, 2024).

## III.   CONCLUSION

Accordingly, we affirm the judgment of the trial court revoking the Defendant's probation on his three-year and eight-month sentence in full. The Defendant is not entitled to relief.

 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE
